UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| DANIEL HIMMEL, Individually and on Behalf of All Others Similarly Situated, | Civil No. 2:10-cv-01104-CNC |
| Plaintiff, | CLASS ACTION |
| vs. | |
| BUCYRUS INTERNATIONAL, INC., et al., | |
| Defendants. | |

| | |
|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Civil No. 2:10-cv-01106-CNC |
| Plaintiff, | CLASS ACTION |
| vs. | |
| BUCYRUS INTERNATIONAL, INC., et al., | |
| Defendants. | |

| | |
|---|---|
| EDMUND J. IMPENS, Individually and on Behalf of All Others Similarly Situated, | Civil No. 2:10-CV-01179-CNC |
| Plaintiff, | CLASS ACTION |
| vs. | |
| BUCYRUS INTERNATIONAL, INC., et al., | |
| Defendants. | |

SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
VIOLATIONS OF §§14(A) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Lead Plaintiff, City of Sterling Heights Police & Fire Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, respectfully brings this second amended direct class action complaint for breach of fiduciary duty and violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder against the herein named defendants and alleges the following:

## SUMMARY OF THE ACTION

1.      This is a direct stockholder class action brought by plaintiff on behalf of the former holders of Bucyrus International, Inc. ("Bucyrus" or the "Company") common stock against Bucyrus' successor in interest, Bucyrus' former Board of Directors (the "Board"), and Caterpillar Inc. ("Caterpillar"), seeking damages against these defendants in connection with the takeover of Bucyrus.

2.      On November 15, 2010, defendants announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Caterpillar would purchase all of Bucyrus' outstanding shares for the inadequate price of $92.00 per share (the "Takeover").

3.      On July 8, 2011, the Takeover was completed, and the Company became a wholly-owned subsidiary of Caterpillar.  However, in connection with the Takeover, the Board failed to abide by their fiduciary duties that they owed to Bucyrus' former shareholders, and failed to provide Bucyrus' former shareholders with sufficient material information about the Takeover that would enable the former shareholders to make intelligent, informed, and rational decisions about whether to accept the Takeover or seek appraisal for the fair value of their shares.

4.      Moreover, defendants took pains to structure the Takeover so that it would preserve a role for management going forward in the combined company, and enable certain Company insiders,

667948_1

including members of senior management and the Board, to accelerate and monetize otherwise illiquid equity interests in the Company and secure other material insider benefits, including change-in-control payments, or "golden parachutes."

5.     To that end, the Board utterly failed to shop the Company to other potential buyers, even thought it was informed by its financial advisors that competing buyers existed that would have been capable of making a competing bid for the Company. The Board's sole justification offered for conducting no shopping process was that it just did not think anyone else would have been interested. Such conduct flies in the face of the Board's duty to maximize shareholder value where, as here, the Company was for sale and the Board had a duty to secure the best price possible.

6.     To make matters worse, the Board agreed to preclusive deal protection devices that made it nearly impossible for competing buyers to make a successful competing bid for the Company. These provisions, which undermined shareholder value, included: (i) a no-shop clause the precluded the Company from communicating with or providing confidential Company information to potential competing bidders except under extremely limited circumstances; (ii) a matching rights provision that provided Caterpillar with three business days to match any competing proposal; (iii) a poison pill lock-up provision that required the Company to continue to deploy the Company's poison pill to prevent any competing bidder from making a tender offer for the Company directly its shareholders, but made the poison pill inapplicable to the Takeover; and (iv) a termination fee provision that required Bucyrus to pay Caterpillar $200 million in the event the Takeover was terminated in favor of a superior proposal. The collective effect of these provisions chilled any possibility of a post-signing market check.

7.     The Board also failed to secure sufficient protection for the Company's former shareholders in connection with the risk that the Takeover could have drawn regulatory scrutiny from antitrust authorities. Despite recognizing the antitrust risk that was inherent in the Takeover, as

667948_1

demonstrated by the Board's retention of antitrust counsel and negotiations regarding certain Merger Agreement provisions, the Board utterly failed to secure any provisions that would have protected the former shareholders in the event a drawn out antitrust review would have taken place, or the Takeover ultimately would have failed due to anti-competitive effects. Specifically, the Board did not secure: (i) any flexibility with respect to operating the Company pending completion of the Takeover; (ii) an agreement by Caterpillar, either a "hell or high water provision" or some lesser provision that would require Caterpillar to divest any of its assets to secure regulatory approval; (iii) Caterpillar's agreement to aggressively pursue regulatory approval; or (iv) a reverse termination fee which would have compensated the former shareholders for damage to the Company during the interim regulatory review period in the event the Takeover would not have been consummated due to anticompetitive effects. Although the Takeover closed without anti-trust scrutiny, the Board's conduct with respect to this real antitrust risk was indicative of its supine position to Caterpillar and disloyalty to Bucyrus' former shareholders.

8.      Furthermore, the consideration offered in the Takeover did not adequately reflect the Company's prospects going forward or its synergistic value to Caterpillar as a merger partner. Indeed, the Takeover was the product of discussions between Bucyrus and Caterpillar regarding a joint venture for a mining equipment business. When Bucyrus acquired Terex Corporation ("Terex"), and its mining equipment business in February 2010, Bucyrus immediately became an attractive takeover target for Caterpillar. By entering into the Takeover, Caterpillar was able to capture the value of Bucyrus' mining equipment business, as well as the rest of Bucyrus' assets, at far less than their actual synergistic value to Caterpillar. Bucyrus' former shareholders, on the other hand, were not allowed to share in these profits going forward, as this was a cash-out transaction that did not include any stock component for shareholders.

9. Further, in an attempt to secure shareholder support for the unfair Takeover, on December 21, 2010, defendants issued a materially false and misleading Definitive Proxy Statement on Form DEFM14A (the "Proxy"). The Proxy, which recommended that Bucyrus former shareholders vote in favor of the Takeover, omitted and/or misrepresented material information about the unfair sales process for the Company, conflicts of interest that corrupted the sales process, the unfair consideration offered in the Takeover, and the actual intrinsic value of the Company on a stand-alone basis and as a merger partner for Caterpillar. Specifically, the Proxy omitted and/or misrepresented the material information further detailed herein in contravention of §§14(a) and 20(a) of the 1934 Act and/or defendants' fiduciary duty of disclosure under state law.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

11. Venue is proper in this District because Bucyrus had its principle place of business in this District. Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District. Furthermore, defendant Caterpillar has extensive contacts in this District through the conducted alleged herein and through its business post Takeover.

## PARTIES

12. At all material times, plaintiff City of Sterling Heights Police & Fire Retirement System was a shareholder of Bucyrus.

667948_1

13.     At the time of the misconduct alleged herein, defendant Bucyrus was a Delaware corporation headquartered in South Milwaukee, Wisconsin.  Post Takeover, Bucyrus filed an amended and restated certificate of incorporation, in which Bucyrus maintains its status as a Delaware corporation.  In a November 15, 2010 release regarding the (then) proposed Takeover, defendant Caterpillar indicated that it intended "to locate its mining business headquarters in South Milwaukee, Wisconsin, where Bucyrus headquarters is currently located, and maintain the Bucyrus brand for the principal Bucyrus legacy products."  Before the Takeover, Bucyrus was a world leader in the design and manufacture of high productivity mining equipment for the surface and underground mining industries.  Bucyrus' surface mining equipment was used for mining coal, copper, iron ore, oil sands and other minerals.  Bucyrus' underground mining equipment was used primarily for mining coal and was also used in mining minerals such as potash and trona.  Prior to the completion of the Takeover, Bucyrus' stock was publicly traded on the NASDAQ Stock Exchange under the ticker "BUCY."

14.     Defendant Timothy W. Sullivan ("Sullivan") was, and at all material times had been, a director of Bucyrus.  Sullivan also served as Bucyrus' President and Chief Executive Officer ("CEO") and held that position since March 2004.  Prior to that time, Sullivan briefly served as the Company's Chief Operating Officer ("COO").

15.     Defendant Theodore C. Rogers ("Rogers") was, and at all material times had been, a director of Bucyrus.  Rogers served as Chairman of the Board since March 2004 and was also a member of the Audit Committee and the Nominating and Corporate Governance Committee.  From December 1999 to March 2004, Rogers also served as the Company's CEO.  Rogers also briefly served as the Company's President from December 1999 to August 2000.

667948_1

16.     Defendant Gene E. Little ("Little") was, and at all material times had been, a director of Bucyrus. Little was the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

17.     Defendant Robert L. Purdum ("Purdum") was, and at all material times had been, a director of Bucyrus and was a member of the Compensation Committee.

18.     Defendant Robert C. Scharp ("Scharp") was, and at all material times had been, a director of Bucyrus and also served as Chairman of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

19.     Defendant Paul W. Jones ("Jones") was, and at all material times had been, a director of Bucyrus and was the Chairman of the Compensation Committee.

20.     Defendant Robert K. Ortberg ("Ortberg") was, and at all material times had been, a director of Bucyrus and was a member of the Compensation Committee.

21.     Defendant Michelle L. Collins ("Collins") was, and at all material times had been, a director of Bucyrus and was a member of the Audit Committee.

22.     Defendant Deepak T. Kapur ("Kapur") was, and at all material times had been, a director of Bucyrus and was a member of the Nominating and Corporate Governance Committee.

23.     The defendants named above in ¶¶14-22 are sometimes collectively referred to herein as the "Individual Defendants" or the "Board."

24.     Defendant Caterpillar is the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines and dieselelectric locomotives. Caterpillar is listed and traded on the New York Stock Exchange under the ticker "CAT."

25.     Defendant Badger Merger Sub, Inc. ("Sub") was a wholly-owned subsidiary of Caterpillar, created as a vehicle to effectuate the Takeover. In connection with the Takeover, Sub merged with Bucyrus and the surviving entity became a wholly-owned subsidiary of Caterpillar.

667948_1

26.     The defendants named above in ¶¶24-25 are collectively referred to herein as "Caterpillar."

## DEFENDANTS' FIDUCIARY DUTIES

27.     Under applicable law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits themselves from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

28.     In accordance with their duties of loyalty and good faith, the defendants, as former directors and/or officers of Bucyrus, were obligated under applicable law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

667948_1

(b)      participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

29.     Plaintiff alleges herein that defendants, separately and together, in connection with the Takeover, knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, good faith and independence owed to plaintiff and other former public shareholders of Bucyrus.

30.     Because defendants knowingly or recklessly breached their duties of loyalty, good faith and independence in connection with the Takeover, the burden of proving the inherent or entire fairness of the Takeover, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## FACTUAL ALLEGATIONS

**Background**

31.     Bucyrus was a world leader in the design and manufacture of high productivity mining equipment for the surface and underground mining industries. Bucyrus' surface mining equipment was used for mining coal, copper, iron ore, oil sands and other minerals. Bucyrus' underground mining equipment was used primarily for mining coal and was also used in mining minerals such as potash and trona.

32.     Despite the economic turmoil preceding the Takeover, Bucyrus had weathered the storm, with its stock price showing significant improvement since March 2, 2009:

- 8 -



33.     The Company's success was probably best stated in its own Schedule 14A, filed with the SEC on November 15, 2010:

> Since becoming a public company in 2004, Bucyrus has done very well. Today, Bucyrus is a true leader in the global mining machinery industry and is poised for continued growth. We have a strong brand, the most expansive offerings in surface and underground mining equipment, technological leadership, a strong and diverse network of customers, and a talented base of employees.

34.     Indeed, according to analysts, ***Bucyrus' earnings had grown over 101 percent*** over the last five years; this was in stark comparison to the 8.30 percent earnings growth rate seen by the industry as a whole during the same period.

35.     Further, analysts estimated that Bucyrus would continue to grow faster than the industry as a whole by 28.50 percent in fiscal year 2011, and 16.80 percent over the subsequent five years:



Case 2:10-cv-01104-CNC   Filed 11/29/11   Page 10 of 39   Document 63

36.     Bucyrus ended fiscal year 2009 strongly.  In its Annual Report for fiscal 2009, filed with the SEC on March 1, 2010, the Company reported an ***18 percent increase in Gross Profit*** over the prior year.

37.     In fiscal 2010, the Company continued to follow its momentum from the previous year and took steps to ensure continued growth for the Company.  For instance, on February 19, 2010, Bucyrus completed a strategic acquisition of Terex Corporation's mining equipment business ("Terex Mining").  This acquisition, valued at $1.0 billion in cash as well as almost 6 million shares of Bucyrus stock, positioned Bucyrus as the premier supplier of mining equipment in the world. According to an official Company press release, dated February 19, 2010, defendant Sullivan, Bucyrus' former President and CEO said: "We are pleased to announce this important milestone for Bucyrus as we begin our 130th year in business.  This transaction is a unique opportunity to build an even stronger company for our customers, employees, and stockholders."

38.     Bucyrus was only just beginning to see a return on its investment in acquiring Terex Mining prior to its Takeover.  Thus, although the Company reported only a 3 percent increase in Gross Profit in its First Quarter Results for fiscal 2010 filed with the SEC on May 7, 2010, the Company's subsequent quarterly filings were indicative of the future growth that the Company was sure to see in the near future.

39.     For instance, in its Second Quarter Results for fiscal 2010, filed with the SEC on May 7, 2010, the Company reported a 20 percent increase in Gross Profits, and in its Third Quarter Results, filed with the SEC on November 9, 2010, the Company reported a 15.5 percent increase in Gross Sales. The Company reported Gross Profits for fiscal 2010 of $1,049,354 on March 1, 2011, and on May 10, 2011, the Company reported a 48 percent increase in Gross Profit over the same period in the prior year.  As the impressive results showed, as well as the above-mentioned analysts predicted, the Company was poised for future growth.

- 10 -

**The Takeover**

40.     The process leading up to the Takeover began in the summer and fall of 2009, when Bucyrus engaged in preliminary discussions with Caterpillar regarding a joint venture in the mining equipment business. A particular focus of these discussions was a line of hydraulic excavators, which neither company produced, and the potentially lucrative business that could be generated by providing a wider range of services to the mining industry.

41.     Bucyrus took the next step into the mining equipment business without Caterpillar when it purchased Terex in February 2010. Notably, Terex's principle asset was a line of hydraulic excavators and related mining equipment. At about this same time, Bucyrus and Caterpillar terminated their discussions around a joint venture.

42.     Discussions about a potential, undisclosed range of transactions between the two companies resumed in August 2010, when the companies' two CEOs met to discuss "some type of combination."

43.     The discussions must have been fruitful, although the contours of these discussions were not disclosed, because soon thereafter the Board retained not one, but two investment banking firms to serve as financial advisors in connection with their discussions with Caterpillar, Deutsche Bank Securities Inc. ("Deutsche Bank") and UBS Securities LLC ("UBS"). The Proxy did not disclose the basis for the Board's determination that it was necessary to hire (and pay) two investment bankers, especially in light of the fact that neither set of bankers apparently did anything but sit in on Board meetings and eventually offer a rubber-stamp fairness opinion. Neither UBS nor Deutsche Bank was asked to solicit potential competing buyers, even though they informed the Board that competing buyers existed, and it was management, and not UBS or Deutsche Bank, that apparently conducted and presented to the Board the financial analysis that the Board relied on during the sales process. Nevertheless, both investment bankers were paid exorbitant sums for

667948_1

whatever services they rendered during the sales process, most of which was contingent on the Takeover being consummated. UBS and Deutsche Bank were each paid $2 million for offering their rubber-stamp fairness opinions, and each were paid an alarming $21.3 million upon the completion of the Takeover. That's a total of $46.6 million for conducting little or no work in connection with the Takeover.

44. After engaging with Caterpillar in August 2010, the Board did absolutely nothing to secure adequate market value for the Company. The Board specifically determined not to reach out to other bidders because they did not think anyone else would be interested. The Proxy did not disclose the basis for this determination.

45. In stark contrast to its duty to maximize the value of the Company for its former shareholders, the Board actually considered other constituencies in its deliberative process, specifically requiring from Caterpillar a representation that it would continue Bucyrus operations in South Milwaukee and retain the Bucyrus brand for certain key product – neither of which is a relevant consideration when the Board's sole duty is to maximize the value of the Company for its stockholders.

46. Despite the infirmities in the process, on November 15, 2010, Bucyrus and Caterpillar announced that the two companies had entered into a definitive agreement pursuant to which Caterpillar would acquire Bucyrus' outstanding shares for the inadequate price of $92.00 per share:

**Caterpillar to Acquire Bucyrus**

Caterpillar Inc. and Bucyrus International, Inc. announced today they have entered into an agreement under which Caterpillar will acquire Bucyrus International in a transaction valued at approximately $8.6 billion (including net debt).

November 15, 2010

PEORIA, Ill. and SOUTH MILWAUKEE, Wis. – Caterpillar Inc. (NYSE: CAT) and Bucyrus International, Inc. (Nasdaq: BUCY) announced today they have entered into an agreement under which Caterpillar will acquire Bucyrus International in a transaction valued at approximately $8.6 billion (including net debt). The acquisition

is based on Caterpillar's key strategic imperative to expand its leadership in the mining equipment industry, and positions Caterpillar to capitalize on the robust long-term outlook for commodities driven by the trend of rapid growth in emerging markets which are improving infrastructure, rapidly developing urban areas and industrializing their economies.

Under the terms of the transaction, which has been approved by the boards of directors of both companies, Bucyrus shareholders will receive $92 per share, $7.6 billion in aggregate consisting of all cash. The transaction represents an implied premium of 32 percent to Bucyrus' share price as of November 12, 2010. Caterpillar will fund the acquisition through a combination of cash from the balance sheet, debt and up to $2 billion in equity. The transaction is expected to close in mid-2011. Caterpillar intends to locate its mining business headquarters in South Milwaukee, Wisconsin, where Bucyrus headquarters is currently located, and maintain the Bucyrus brand for the principal Bucyrus legacy products.

"For several years, mining customers have been asking us to expand our range of products and services to better serve their increasingly complex requirements," said Caterpillar Chairman and CEO Doug Oberhelman. "This announcement says to those customers, we heard you loud and clear. It is a strong statement about our belief in the bright future of the mining industry. Our strategy calls for disciplined investment in attractive industries that value our product and service delivery model," Oberhelman said. "Our performance through the global economic turmoil of 2008-2009 allowed us to emerge with a strong balance sheet and the ability to make strategic investments in companies like Bucyrus. This, and other recent acquisitions, will position Caterpillar for industry leadership and will be positive for our stockholders, customers and employees."

Tim Sullivan, Bucyrus President and CEO, said, "This is an outstanding and financially compelling transaction for our shareholders. More fundamentally, it is a testament to the tremendous value our talented team of employees has created over the past several years and to the strength of our brand in the global mining machinery marketplace. I am confident that we have found an excellent partner in Caterpillar. Caterpillar is a first-rate global company and it shares our commitment to providing innovative products and exceptional service to customers, creating a collaborative and safe work environment for employees and minimizing the impact on the environment. We are very pleased that Caterpillar has committed to locate its mining business headquarters in Milwaukee and we are confident that the combined global platform will be extremely well positioned to capitalize on the substantial growth opportunities in this market in the years ahead."

The closing of the transaction is subject to regulatory approvals, customary closing conditions and approval by Bucyrus stockholders. At that time, Caterpillar Group President Steve Wunning will have executive office accountability for Bucyrus, along with his current responsibilities for the company's mining business.

"Even today at mine sites around the world, our customers are using Bucyrus shovels to load Caterpillar mining trucks," Wunning said. "This combination, as well as the

667948_1

significant expansion in products and facility capacity already announced, gives us the opportunity to expand the range of surface and underground mining products and solutions offered to customers by Caterpillar and its dealer network."

A driving motivation for the transaction is Caterpillar's estimate of more than $400 million in annual synergies beginning in 2015 derived from the combined financial strength and complementary product offerings of the combined mining equipment businesses.

Synergies driven by the acquisition include:

> Market leading sales and support capabilities of Caterpillar dealers and a broad, one-stop shop for global mining customers

> Caterpillar Remanufacturing products and services for Bucyrus equipment

> Caterpillar engines and components to enhance performance and lower owning and operating costs for Bucyrus equipment

> Additional scale and cost efficiencies in areas such as purchasing and engineering

> Deployment of manufacturing best practices through the Caterpillar Production System

**Advisors**:

> J.P. Morgan Securities LLC served as exclusive financial advisor for Caterpillar and has provided committed financing for the transaction. Mayer Brown LLP, Sidley Austin LLP and Howrey LLP served as legal advisors for Caterpillar.

> Deutsche Bank Securities Inc. and UBS Investment Bank served as financial advisors for Bucyrus.  Sullivan & Cromwell LLP and Arnold & Porter LLP served as legal advisors for Bucyrus.

47.     The Takeover was the product of a fundamentally flawed process, undertaken in breach of the Board's fiduciary duties, and designed to ensure the sale of Bucyrus to Caterpillar on terms preferential to Caterpillar and Company insiders.

48.     Specifically, defendants took pains to structure the Takeover so that it would preserve a role for management going forward in the combined company, and enable certain Company insiders, including members of senior management and the Board, to accelerate and monetize

- 14 -

otherwise illiquid equity interests in the Company and secure other material insider benefits, including change-in-control payments, or "golden parachutes."

49.     Moreover, the Board utterly failed to shop the Company to other potential buyers, even thought it was informed by its financial advisors that competing buyers existed that would have been capable of making a competing bid for the Company.  The Board's sole justification offered for conducting no shopping process was that it just did not think anyone else would have been interested.  Such conduct flies in the face of the Board's duty to maximize shareholder value where, as here, the Company was for sale and the Board had a duty to secure the best price possible.

50.     To make matters worse, the Board agreed to preclusive deal protection devices that made it nearly impossible for competing buyers to make a successful competing bid for the Company.  These provisions, which undermined shareholder value, included: (i) a no-shop clause that precluded the Company from communicating with or providing confidential Company information to potential competing bidders except under extremely limited circumstances; (ii) a matching rights provision that provided Caterpillar with three business days to match any competing proposal; (iii) a poison pill lock-up provision that required the Company to continue to deploy the Company's poison pill to prevent any competing bidder from making a tender offer for the Company directly to its former shareholders, but made the poison pill inapplicable to the Takeover; and (iv) a termination fee provision that required Bucyrus to pay Caterpillar $200 million in the event the Takeover was terminated in favor of a superior proposal.  The collective effect of these provisions chilled any possibility of a post-signing market check.

51.     The Board also failed to secure sufficient protection for the Company's former shareholders in connection with the risk that the Takeover would have drawn regulatory scrutiny from antitrust authorities.  Despite recognizing the antitrust risk that was inherent in the Takeover, as demonstrated by the Board's retention of antitrust counsel and negotiations regarding certain Merger

Agreement provisions, the Board utterly failed to secure any provisions that would have protected shareholders in the event a drawn out antitrust review had taken place, or the Takeover ultimately would have failed due to anti-competitive effects. Specifically, the Board did not secure: (i) any flexibility with respect to operating the Company pending completion of the Takeover; (ii) an agreement by Caterpillar, either a "hell or high water provision" or some lesser provision that would require Caterpillar to divest any of its assets to secure regulatory approval; (iii) Caterpillar's agreement to aggressively pursue regulatory approval; or (iv) a reverse termination fee which would have compensated the former shareholders for damage to the Company during the interim regulatory review period in the event the Takeover was not consummated due to anticompetitive effect. Although the Takeover closed without anti-trust scrutiny, the Board's conduct with respect to this real antitrust risk was indicative of its supine position to Caterpillar and disloyalty to Bucyrus' former shareholders.

52.     Furthermore, the consideration offered in the Takeover did not adequately reflect the Company's prospects going forward or its synergistic value to Caterpillar as a merger partner. Indeed, the Takeover was the product of discussions between Bucyrus and Caterpillar regarding a joint venture for a mining equipment business. When Bucyrus acquired Terex, and its mining equipment business in February 2010, Bucyrus immediately became an attractive takeover target for Caterpillar. By entering in the Takeover, Caterpillar was able to capture the value of Bucyrus' mining equipment business, as well as the rest of Bucyrus' assets, at far less than their actual synergistic value to Caterpillar. Bucyrus' former shareholders, on the other hand, were not allowed to share in these profits going forward, as this was a cash-out transaction that did not include any stock component for shareholders.

53.     To be sure, the Takeover allowed Caterpillar to reap an advantage that was not shared by Bucyrus' former shareholders, and unfairly deprived Bucyrus' former shareholders of same. As

stated in the Company's Schedule 14A, filed with the SEC on November 15, 2010: "Our Company has been performing well and I believe *we all think we could have continued to have a bright future as an independent company*." As a result of the Takeover, Bucyrus' former shareholders were cashed out at a price that did not reflect their equity stake in the Company, all while Caterpillar reaped the benefit of Bucyrus' recent acquisition of Terex Mining, as well as the other steps that Bucyrus had taken in recent years to position itself as a global leader in its field.

54.     In light of all of the above-stated misconduct, the Takeover consideration substantially undervalued Bucyrus and was merely an attempt by Caterpillar to acquire Bucyrus for a bargain during a temporary downturn in the economy. Indeed, Bucyrus's stock traded at $75.08 per share as early as October 11, 2010, and the Company was sure to continue its upward momentum in the absence of the Takeover.

**The Materially Misleading Proxy**

55.     In order to secure shareholder approval of this unfair deal, defendants filed the materially misleading Proxy. The Proxy, which recommended that Bucyrus' former shareholders vote in favor of the Takeover, omitted and/or misrepresented material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company. Specifically the Proxy omitted and/or misrepresented the material information set forth below in contravention of §§14(a) and 20(a) of the 1934 Act and/or defendants' duty of candor and full disclosure under state law.

56.     ***The potential joint venture between Bucyrus and Caterpillar that was discussed in the summer and fall of 2009 and the reasons why the discussions were terminated***. On page 25 of the Proxy, defendants referred to discussions between Bucyrus and Caterpillar regarding a potential joint venture for the mining equipment business. These discussions are referenced in two additional portions of the Proxy, later on page 25 and again on page 26. The Proxy did not disclose what the

proposed venture entailed, nor did it disclose the reasons why discussions concerning the joint venture broke off in February 2010, despite a specific reference on page 26 to a discussion between the two companies' CEOs about why the discussions were abandoned. The omission of this information rendered the Proxy materially misleading because former shareholders were entitled to know what strategic alternatives to the Takeover were considered by the Board, especially in light of the timing of the discussions, which broke off right after the Company acquired Terex, assets which Caterpillar openly coveted, and shortly thereafter segued into the discussions which led to the Takeover.

57.     ***Management strategic plan and 10-year financial forecast as discussed with the Board on October 20, 2010, October 29, 2010, provided to UBS and Deutsche Bank for use in their financial valuations, and shared with Caterpillar***. The Proxy made reference to two Board meetings where the Board was presented with management's strategic plan and financial forecasts, and also explicitly stated that management's forecasts were relied on by UBS and Deutsche Bank in their financial analysis, and that the financial forecasts were also shared with Caterpillar. These forecasts were not disclosed in any fashion in the Proxy. This information is material because former shareholders were entitled to be informed of management's best estimates of the Company's future cash flows, especially when the projections formed the bases for the fairness opinions offered by the Board's financial advisors and the value assumptions presented to the buyer, Caterpillar.

58.     Specifically, the information regarding the projections are material because they underscore appropriate pricing multiples to apply to the Company's financial and operating metrics, since such multiples are necessarily influenced by a company's financial and operating outlook. This is true of cyclical companies such as Bucyrus was, since such companies tend to exhibit materially different multiples depending on whether they are near the top or bottom of the company's place in the industry cycle (or somewhere in between). Inclusion of the projections would have given the

- 18 -

former shareholders of Bucyrus insight into management's assessment of Bucyrus' place in the industry cycle. This, in turn, would have informed shareholders' judgments regarding the selection of appropriate pricing multiples.

59.     For example, the Discounted Cash Flow ("DCF") results of the Company's financial advisors ranged from as low as $72.50 per share to as high as $107.00 per share.  Inclusion of the projections in the Proxy would have enabled shareholders to independently determine where along the continuum between $72.50 and $107.00 they believed the value of Bucyrus' (then) future cash flows would have fallen and then to use that independent determination as a basis for voting or seeking appraisal of their shares.  Instead, the former shareholders of Bucyrus were forced to rely on the inconclusive range of indications presented in the Proxy.

60.     Additionally, the omission of this information related to projections rendered the following portions of the Proxy materially misleading:

(a)     The references in the Proxy on pages 26 and 27 to the two Board meetings where the forecasts were discussed with the Board, including the "assumptions and risk factors underlying the plan";

(b)     The reference to the discussion with Caterpillar during the week of October 25, 2010, when "working teams from Bucyrus and Caterpillar met in Chicago to review Bucyrus' business model assumptions";

(c)     The summary of the Deutsche Bank opinion on pages 32-37, particularly with respect to Deutsche Bank's Illustrative Discounted Cash Flow Analysis on pages 34-35, which was based on management estimates of the Company's free cash flows for the years 2001 through 2020, and Deutsche Bank's Analysis of Selected Publicly Traded Companies on page 36, which was based in part on managements' estimated EBITDA for the calendar year 2011; and

(d)     The summary of the UBS opinion on pages 38-43, particularly with respect to UBS's Discounted Cash Flow Analysis on page 42, which was based on "financial forecasts and estimates relating to the Company prepared by the Company's management," and UBS's Selected Companies Analysis on page 41, which was based in part on managements' estimated EBITDA for the calendar years 2011 and 2012.

61.     ***The potential stock component of the merger consideration, including the valuation of the component and related collar provision***.  The Proxy discussed a potential equity component of the consideration in the form of Caterpillar stock, but did not disclose the proposed value of this component or the discussions around a collar for the equity component to ensure it did not drop significantly in value after the Takeover was announced.  The omission of this information rendered the portions of the Proxy on pages 27-28 that refer to the discussions regarding the equity component materially misleading, particularly given the extensive analysis and attention that was apparently given to the discussions, including whether the equity component would be "a fixed component of the consideration and/or priced at closing."  This information is material to shareholders because the equity component would have given former shareholders an ownership interest in the surviving company and the opportunity to benefit from the synergies associated with the Terex acquisition, which Bucyrus' former shareholders did not have the opportunity to fully benefit from as Bucyrus shareholders.

62.     ***The basis for the Board's determination not to have sought out potential competing bids***.  On page 27 of the Proxy, defendants disclosed that the Board decided not to shop the Company because "it was highly unlikely that a credible alternative acquirer would emerge."  Defendants did not disclose the basis for this determination, rendering the Proxy materially misleading on this issue.  This information is material because the Board had a duty to secure the best price available for the Company, and to have conducted at least some form of an auction

process to fulfill that duty to the former shareholders. Bucyrus' former shareholders were entitled to be informed before they were asked to vote on the Takeover regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the prohibitively large termination fee of $200 million, which, along with the other preclusive deal protection devices, destroyed any opportunity to conduct a post-signing market check.

63.     *The due diligence issues that Caterpillar and its representatives indicated could have negatively impacted the merger consideration by approximately $4 per share, as identified in meetings on November 11, 2010*.  On page 28 of the Proxy, defendants disclosed that Caterpillar took the position that certain due diligence that was gathered could have had a significant impact on the merger consideration, but defendants did not disclose what this information was.  This information was material to former shareholders because it potentially affected the consideration offered in the Takeover (defendants did not disclose whether it did or not), and former shareholders were entitled to all information bearing on the value of their equity interests and the consideration being offered.  The omission of this information, thus, rendered the discussion of this issue in the Proxy materially misleading.

64.     *Management's presentation regarding financial aspects of the proposal from Caterpillar, as discussed with the Board on November 14, 2010*.  Management presented an analysis of the Caterpillar proposal to the Board, but none of this information was disclosed in the Proxy.  This information was material because former shareholders were entitled to be informed regarding the analysis the Board relied on when agreeing to the Takeover.  Indeed, to the same extent former shareholders were entitled to fair summary of the analyses conducted by UBS and Deutsche Bank, they were also entitled the details of management's analyses when presented in the same context – perhaps more so because management knew the Company better than the investment

bankers. The omission of this information, thus, rendered the discussion of the analysis in the Proxy materially misleading.

65.     ***The basis for the selection of EBITDA multiples in Deutsche Bank's Illustrative Discounted Cash Flow Analysis***. The Proxy did not disclose how Deutsche Bank derived the range of EBITDA multiples employed in its Illustrative Discounted Cash Flow Analysis. This omission is material because the choice of terminal EBITDA multiples had such a dramatic effect on the output of a discounted cash flow analysis, and Deutsche Bank selected a range of terminal EBITDA multiples that appears to have been too low in light of: (a) LTM EBITDA multiples ranging as high as 10.2x for its own Analysis of Selected Precedent Transactions, (b) its selection of a reference range of 8.0x-10.5x for the Analysis of Selected Precedent Transactions, (c) forward EBITDA multiples ranging from 7.7x to 13.8x for its own Analysis of Selected Publicly Traded Companies, and (d) its selection of a reference range of 8.0x-9.5x for the Analysis of Selected Publicly Traded Companies. This omission rendered Deutsche Bank's Illustrative Discounted Cash Flow Analysis materially misleading because without this information, shareholders were not in a position to determine whether or not they should have relied on Deutsche Bank's analyses, or whether the analyses adequately reflected the long-term intrinsic value of the Company.

66.     ***The selection and exclusion criteria employed by Deutsche Bank in its Analysis of Selected Precedent Transactions***. The Proxy did not disclose the basis upon which Deutsche Bank selected the five transactions it analyzed in its Analysis of Selected Precedent Transactions. This omission rendered the discussion of the analysis materially misleading because of the small sample size selected, spanning a period of ten years. Without this information, shareholders were not in a position to determine if the sample transactions were an adequate comparable set for Deutsche Bank's analysis and, thus, whether they should have relied on the analysis at all.

67. ***The transaction-by-transaction detail of the pricing multiples for the transactions selected by Deutsche Bank for its Analysis of Selected Precedent Transactions***. The Proxy disclosed only the high, low, mean, and median multiples for the selected transactions, but not the underlying detail of the pricing multiples. The omission of this information rendered the analysis materially misleading because without it, shareholders were not in a position to be able to determine if the transactions sampled were adequate comparables for the Company. Further, omission of this information rendered Deutsche Bank's Illustrative DCF Analysis even more misleading because Deutsche Bank relied in part on the multiples derived from this analysis in selecting the terminal EBITDA multiples for its Illustrative Discounted Cash Flow Analysis.

68. ***The selection and exclusion criteria employed by Deutsche Bank in its Analysis of Selected Publicly Traded Companies***. The Proxy did not disclose the basis upon which Deutsche Bank selected the companies it analyzed in its Analysis of Selected Publicly Traded Companies. This omission rendered the discussion of the analysis materially misleading because, without this information, shareholders were not in a position to determine if the selected companies were an adequate comparable set for Deutsche Bank's analysis and, thus, whether they should have relied on the analysis at all.

69. ***The company-by-company detail of the pricing multiples for the transactions selected by Deutsche Bank for its Analysis of Selected Publicly Traded Companies***. The Proxy disclosed only the high, low, mean, and median multiples for the selected companies, but not the underlying detail of the pricing multiples. The omission of this information rendered the analysis materially misleading because without it, shareholders were not in a position to be able to determine if the companies sampled were adequate comparables for the Company. Further, omission of this information rendered Deutsche Bank's Illustrative Discounted Cash Flow Analysis even more

- 23 -

misleading because Deutsche Bank relied in part on the multiples derived from this analysis in selecting the terminal EBITDA multiples for its Illustrative Discounted Cash Flow Analysis.

70. ***The basis for Deutsche Bank's decision not to analyze LTM EBITDA multiples in its Selected Publicly Traded Companies Analysis***. The Proxy did not disclose why Deutsche Bank chose not to analyze LTM EBITDA multiples in its Selected Publicly Traded Companies Analysis. This omission is material because such analysis is customarily conducted in connection with this type of analysis, and shareholders were entitled to know why it was not conducted here, which bears on the propriety of former shareholders' reliance on the analysis at all. Moreover, this omission rendered Deutsche Bank's Illustrative Discounted Cash Flow Analysis even more misleading because Deutsche Bank relied in part on the multiples derived from this analysis in selecting the terminal EBITDA multiples for its Illustrative Discounted Cash Flow Analysis.

71. ***The basis for the selection of EBITDA multiples in UBS's Discounted Cash Flow Analysis***. The Proxy did not disclose how UBS derived the range of EBITDA multiples employed in its DCF Analysis. This omission is material because the choice of terminal EBITDA multiples has such a dramatic effect on the output of a discounted cash flow analysis, and UBS selected a range of terminal EBITDA multiples that appears to have been too low in light of: (a) considerably higher Calendar 2010 EBITDA multiples ranging from 9.4x to 15.4x for its own Selected Transactions Analysis, and (b) somewhat higher LTM EBITDA multiples ranging from 6.2x to 10.7x for its own Selected Transactions Analysis. This omission rendered UBS's DCF Analysis materially misleading because without this information, former shareholders were not in a position to determine whether or not they should have relied on UBS's analysis, or whether the analysis adequately reflected the long-term intrinsic value of the Company.

72. ***The selection and exclusion criteria employed by UBS in its Selected Transactions Analysis***. The Proxy did not disclose the basis upon which UBS selected the five transactions it

analyzed in its Analysis of Selected Precedent Transactions. This omission rendered the discussion of the analysis materially misleading because of the small sample size selected, spanning a period of ten years. Without this information, shareholders were not in a position to have determined if the sample transactions were an adequate comparable set for UBS's analysis and thus whether they should have relied on the analysis at all.

73. ***The transaction-by-transaction detail of the pricing multiples for the transactions selected by UBS for its Selected Transactions Analysis***. The Proxy disclosed only the high, low, mean, and median multiples for the selected transactions, but not the underlying detail of the pricing multiples. The omission of this information rendered the analysis materially misleading because without it, former shareholders were not in a position to have been able to determine if the transactions sampled were adequate comparables for the Company. Further, omission of this information rendered UBS's DCF Analysis even more misleading because UBS relied in part on the multiples derived from this analysis in selecting the terminal EBITDA multiples for its DCF Analysis.

74. ***The selection and exclusion criteria employed by UBS in its Selected Companies Analysis***. The Proxy did not disclose the basis upon which UBS selected the companies it analyzed in its Selected Companies Analysis. This omission rendered the discussion of the analysis materially misleading because, without this information, former shareholders were not in a position to have determined if the selected companies were an adequate comparable set for UBS's analysis and thus whether they should have relied on the analysis at all.

**The Takeover Closed Unlawfully**

75. On July 12, 2011, on Form 8-K, defendants announced the completion of the Takeover:

> On July 8, 2011, Bucyrus International, Inc. (the "Company") and Caterpillar Inc., a Delaware corporation ("Caterpillar"), completed the previously announced merger of

a wholly owned subsidiary of Caterpillar with and into the Company in accordance with the Agreement and Plan of Merger, dated as of November 14, 2010, by and among Caterpillar, Badger Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Caterpillar ("Merger Sub") and the Company (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, Merger Sub merged with and into the Company (the "Merger"), with the Company continuing as the surviving entity and a wholly owned subsidiary of Caterpillar. The Merger became effective on July 8, 2011 at 8:48 a.m., Central Daylight Time (the "Effective Time").

76.     The Takeover closed without defendants having provided the above-mentioned material information to Bucyrus' former shareholders. Defendants were in possession of that information but failed to disclose it to the Company's former shareholders in connection with the Takeover.

77.     As a result of the breach of fiduciary duties of Bucyrus' former Board, including the materially misleading and inadequate Proxy, plaintiff and the Class were damaged.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action individually and as a class action on behalf of all holders of Bucyrus stock who were harmed by defendants' actions described above (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

79.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

80.     The Class is so numerous that joinder of all members is impracticable. According to Bucyrus' Quarterly Report, filed with the SEC on May 5, 2011, as of May 3, 2011 there were over 80 million outstanding shares of Bucyrus common stock, held by hundreds, if not thousands, of beneficial holders.

81.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Takeover;

(b)     whether the Individual Defendants engaged in self dealing in connection with the Takeover;

(c)     whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Takeover;

(d)     whether the Individual Defendants unjustly enriched themselves and other insiders or affiliates of Bucyrus;

(e)     whether the Individual Defendants breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Takeover, including the duties of good faith, diligence, honesty and fair dealing;

(f)     whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets; and

(g)     whether Caterpillar aided and abetted the wrongful acts of the Individual Defendants.

82.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

83.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

84.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

85.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

86.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

### Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

87.     Plaintiff repeats and realleges each allegation set forth herein.

88.     Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the former public shareholders of Bucyrus and have acted to put their personal interests and the interest of Caterpillar ahead of the interests of Bucyrus' former shareholders.

89.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith unfairly deprived plaintiff and other members of the Class of the ability to make informed and intelligent decisions regarding their former investment in Bucyrus.

90.     As demonstrated by the allegations above, defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith and independence owed to the former shareholders of Bucyrus because, among other reasons, they failed to provide all

- 28 -

material information about the Takeover to Bucyrus' former shareholders, and act in accordance with their fundamental duties of good faith, due care and loyalty.

91.     By reason of the foregoing acts, practices and course of conduct, defendants violated their fiduciary obligations toward plaintiff and the other members of the Class.

92.     As a result of defendants' unlawful actions, plaintiff and the other members of the Class have been damaged.

## COUNT II

### Aiding & Abetting the Individual Defendants' Breach of Fiduciary Duty
### (Against Defendant Caterpillar)

93.     Plaintiff repeats and realleges each allegation set forth herein.

94.     Defendant Caterpillar is sued herein as an aider and abettor of the breaches of fiduciary duties outlined above by the Individual Defendants, as former members of the Board of Bucyrus.

95.     The Individual Defendants breached their fiduciary duties of good faith, loyalty, and due care to the former Bucyrus shareholders by failing to provide all material information about the Takeover to Bucyrus' former shareholders, and act in accordance with their fundamental duties of good faith, due care and loyalty.

96.     Such breaches of fiduciary duties could not, and would not, have occurred but for the conduct of defendant Caterpillar which, therefore, aided and abetted such breaches *via* entering into the Merger Agreement.

97.     Defendant Caterpillar had knowledge that it was aiding and abetting the Individual Defendants' breach of their fiduciary duties to the former Bucyrus shareholders.

98.     Defendant Caterpillar rendered substantial assistance to the Individual Defendants in the breach of their fiduciary duties to the former Bucyrus shareholders.

99.     As a result of Caterpillar's conduct of aiding and abetting the Individual Defendants' breaches of fiduciary duties, plaintiff and the other members of the Class have been damaged.

## COUNT III

### Against the Individual Defendants and Caterpillar for Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.     During the relevant period, the Individual Defendants and Caterpillar disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.     The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and Caterpillar. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Takeover, and the actual intrinsic value of the former Company's assets.

103.     In so doing, the Individual Defendants and Caterpillar made misleading statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company, the Individual Defendants and Caterpillar were aware of this information and of their duty to disclose this information in the Proxy.

104.     The Individual Defendants and Caterpillar were at least negligent in filing the Proxy with these materially false and misleading statements.

105.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to have voted on the Takeover. In addition, a reasonable investor would have viewed a full and accurate disclosure as

- 30 -

significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to former shareholders.

106.     By reason of the foregoing, the Individual Defendants and Caterpillar violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

107.     Due to the false and misleading statements in the Proxy, plaintiff suffered damages, including but not limited to out-of-pocket losses.

## COUNT IV

### Against the Individual Defendants and Caterpillar for
### Violation of §20(a) of the 1934 Act

108.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.     The Individual Defendants acted as controlling persons of Bucyrus within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Bucyrus and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading.

110.     Each of the Individual Defendants and Caterpillar was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

111.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as

alleged herein, and exercised the same. The Proxy at issue contained the unanimous recommendation of each of the Individual Defendants to approve the Takeover. They were thus directly involved in the making of this document.

112. Caterpillar also had direct supervisory control over composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

113. In addition, as the Proxy set forth at length, and as described herein, the Individual Defendants and Caterpillar were each involved in negotiating, reviewing and approving the Takeover. The Proxy purported to describe the various issues and information that they reviewed and considered, descriptions which had input from both the directors and Caterpillar.

114. By virtue of the foregoing, the Individual Defendants and Caterpillar violated §20(a) of the 1934 Act.

115. As set forth above, the Individual Defendants and Caterpillar had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, Bucyrus' former shareholders were damaged.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands relief in its favor and in favor of the Class and against defendants as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of defendants and is therefore unlawful and unenforceable;

C.  Awarding plaintiff and the Class damages caused by the breach of fiduciary duties of the Board;

D.  Awarding plaintiff and the Class damages caused by defendants' violations of federal law;

E.  Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

DATED:  November 29, 2011                Respectfully submitted,

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        RANDALL J. BARON
                                        A. RICK ATWOOD, JR.
                                        DAVID T. WISSBROECKER


                                                s/ David T. Wissbroecker
                                        ─────────────────────────────
                                            DAVID T. WISSBROECKER

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        STUART A. DAVIDSON
                                        CULLIN A. O'BRIEN
                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone:  561/750-3000
                                        561/750-3364 (fax)

                                        Lead Counsel for Plaintiff

- 33 -

HALE & WAGNER, S.C.
K. SCOTT WAGNER (SBN 1004668)
839 North Jefferson Street, Suite 400
Milwaukee, WI 53202
Telephone: 414/278-7000
414/278-7590 (fax)
Email: ksw@halewagner.com

Liaison Counsel

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

667948_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 29, 2011.

s/ David T. Wissbroecker
DAVID T. WISSBROECKER

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: dwissbroecker@rgrdlaw.com

667948_1

# Mailing Information for a Case 2:10-cv-01104-CNC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randall J Baron**
  randyb@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **John C Cabaniss**
  john@cabanisslaw.com,nina@cabanisslaw.com

- **Jacques C Condon**
  jcc@halewagner.com,kls@halewagner.com,jlm@halewagner.com,lse@halewagner.com

- **Robert L Elliott**
  rle@attorneyelliott.com,cindy@attorneyelliott.com

- **Heather M Friedl**
  hmf@halewagner.com,kls@halewagner.com,lse@halewagner.com,ckw@halewagner.com

- **Cristina D Hernandez**
  cristina.hernandez@quarles.com,rachel.wroblewski@quarles.com

- **John L Kirtley**
  jkirtley@gklaw.com,criedel@gklaw.com

- **Natalie G Maciolek**
  natalie.maciolek@quarles.com,kristen.miller@quarles.com,margie.kupsik@quarles.com

- **Stephen J Oddo**
  soddo@robbinsumeda.com,notice@robbinsumeda.com,athompson@robbinsumeda.com

- **Elizabeth C Perkins**
  elizabeth.perkins@quarles.com,ks3@quarles.com

- **Howard A Pollack**
  hpollack@gklaw.com,mhojnacki@gklaw.com

- **David J Syrios**
  dsyrios@ademilaw.com

- **K Scott Wagner**
  ksw@halewagner.com,kls@halewagner.com,jlm@halewagner.com,lse@halewagner.com

- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com,jaimem@rgrdlaw.com

## Manual Notice List

Case 2:10-cv-01104-CNC   Filed 11/29/11   Page 37 of 39   Document 63

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Arshan          Amiri**
Robbins Umeda LLP
600 B St - Ste 1900
San Diego, CA 92101

**A               Rick Atwood                                             , Jr**
Robbins Geller Rudman & Dowd LLP
655 W Broadway - Ste 1900
San Diego, CA 92101

**Walter          C Carlson**
Sidley Austin LLP
1 S Dearborn St
Chicago, IL 60603

**Stuart          A Davidson**
Robbins Geller Rudman & Dowd LLP
120 E Palmetto Park Rd - Ste 500
Boca Raton, FL 33432

**James           W Ducayet**
Sidley Austin LLP
1 S Dearborn St
Chicago, IL 60603

**William         Scott Holleman**
Levi & Korsinsky LLP
30 Broad St - 15th Fl
New York, NY 10004

**Matthew         B Kilby**
Sidley Austin LLP
1 S Dearborn St
Chicago, IL 60603

**Eduard          Korsinsky**
Levi & Korsinsky LLP
30 Broad St - 15th Fl
New York, NY 10004

**Thomas          C Michaud**
Vanoverbeke Michaud & Timmony PC
79 Alfred St
Detroit, MI 48201

**Cullin          A O'Brien**
Robbins Geller Rudman & Dowd LLP
120 E Palmetto Park Rd - Ste 500
Boca Raton, FL 33432

**Rebecca         A Peterson**
Robbins Umeda LLP
600 B St - Ste 1900
San Diego, CA 92101

**Marc            M Umeda**

Case 2:10-cv-01104-CNC   Filed 11/29/11   Page 38 of 39   Document 63

Robbins Umeda LLP
600 B St - Ste 1900
San Diego, CA 92101

**Robbins             Umeda**
Robbins Umeda LLP
600 B St - Ste 1900
San Diego, CA 92101

**Michael             J Vanoverbeke**
Vanoverbeke Michaud & Timmony PC
79 Alfred St
Detroit, MI 48201

**William             C Wright**
The Wright Law Office PA
301 Clematis St - Ste 3000
West Palm Beach, FL 33401