UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

DANIEL HIMMEL,

    Plaintiff,

   v.        Case No.  10-C-1104

BUCYRUS INTERNATIONAL, INC.
TIMOTHY SULLIVAN,
CRAIG R. MACKUS,
THEODORE C. ROGERS,
ROBERT L. PURDUM,
GENE E. LITTLE,
ROBERT C. SCHARP,
PAUL W. JONES,
ROBERT K. ORTBERG,
DEEPAK T. KAPUR,
MICHELLE L. COLLINS,
CATERPILLAR INC.,
BADGER MERGER SUB INC.,

    Defendants.

---

CITY OF STERLING HEIGHTS
POLICE & FIRE RETIREMENT SYSTEM,

    Plaintiff,

   v.        Case No.  10-C-1106

BUCYRUS INTERNATIONAL, INC.
TIMOTHY W. SULLIVAN,
THEODORE C. ROGERS,
GENE E. LITTLE,
ROBERT L. PURDUM,
ROBERT C. SCHARP,
PAUL W. JONES,
ROBERT K. ORTBERG,
MICHELLE L. COLLINS,
DEEPAK T. KAPUR,
CATERPILLAR INC.,
BADGER MERGER SUB, INC.,

    Defendants.

---

EDMUND J. IMPENS,

        Plaintiff,

        v.                                    Case No.  10-C-1179

TIMOTHY SULLIVAN,
THEODORE ROGERS,
ROBERT L. PURDUM,
GENE E. LITTLE,
ROBERT C. SHARP,
PAUL W. JONES,
ROBERT K. ORTBERG,
MICHELLE L. COLLINS,
DEEPAK T. KAPUR,
BUCYRUS INTERNATIONAL INC.,
BADGER MERGER SUB, INC.,

        Defendants.

_____

### DECISION REGARDING MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (DOC. 66) AND ORDER DISMISSING CASE

      Following appointment, the lead plaintiff in this consolidated case, City of Sterling Heights Police & Fire Retirement System, filed a Second Amended Complaint ("the Complaint"). Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6).

      A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) requires a plaintiff to clear two hurdles. *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint must describe the claim in sufficient detail to give a defendant fair notice of the claim and the grounds on which it rests. *Id.* Although specific facts are not necessary, "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). Second, the complaint must set forth a

claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). The "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *EEOC*, 496 F.3d at 776 (citing *Bell Atl. Corp.*, 550 U.S. at 555-56, 569 n.14 (2007)). When considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

CONSIDERATION OF DOCUMENTS IN ADDITION TO THE COMPLAINT

Documents submitted with a motion to dismiss may be considered part of the pleadings if they are referred to in the plaintiff's complaint and central to a claim. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002); *see also Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). This rule prevents parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents to the complaint. *188 LLC*, 300 F.3d at 735. The exception is narrow; it is aimed at situations in which a plaintiff quotes from a document or the case requires interpretation of an unattached contract, for instance. *Tierney*, 304 F.3d at 738.

Here, plaintiff referred to a proxy statement (hereinafter "Proxy") extensively in its Complaint, citing to specific pages of that document and asserting that omissions of certain information rendered identified portions of the Proxy misleading (*see* Doc. 63 ¶¶ 9, 55-74), yet they did not attach the Proxy to the Complaint. On the other hand, defendants included the Proxy with their motion to dismiss. Hence, the court will consider the Proxy as permitted

3

by *188 LLC. See also In re Gen. Motors (Hughes) S'holder Litig.*, No. Civ. A. 20269, 2005 WL 1089021, *6, *13 n.26 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

Further, the court may take judicial notice of facts in the public record—such as filings with state agencies—if these facts are not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008). Defendants submitted a copy of the Restated Certificate of Incorporation of Bucyrus International, Inc., presumably filed with the Delaware Division of Corporations. (*See* Doc. 67 Ex. B.) In response, plaintiff did not suggest that the copy, even though unauthenticated, is incorrect or was not filed with the proper authorities in Delaware. Thus, the court will take judicial notice of the Restated Certificate of Incorporation. *See In re Alloy, Inc.*, No. Civ. A. 5626-VCP, 2011 WL 4863716, *3 n.3, *5 n.19 (Del. Ch. Oct. 13, 2011).

## ALLEGATIONS IN THE COMPLAINT

Plaintiff divides its allegations into four claims: (1) breach of the fiduciary duties of care, loyalty, good faith, candor and independence, and disclosure by the individual defendants; (2) aiding and abetting the directors' breached of fiduciary duty by Caterpillar; (3) violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 of the Securities Exchange Commission, 17 C.F.R. § 240.14a-9, by Caterpillar and the individual defendants; and (4) violation of Section 20(a) of the Act, 15 U.S.C. § 78t(a), by Caterpillar and the individual defendants.

Prior to July 8, 2011, Bucyrus International, Inc., was a Delaware corporation headquartered in South Milwaukee, Wisconsin. (Doc. 63 ¶ 13.) Bucyrus's stock was

publicly traded on the NASDAQ Stock Exchange. (Doc. 63 ¶ 13.) The City of Sterling Heights Police & Fire Retirement System (the "Retirement System") was a shareholder of Bucyrus. (Doc. 63 ¶ 12.) Bucyrus's stock price had shown significant improvement since March 2, 2009. (Doc. 63 ¶ 32.)

Bucyrus was a world leader in the design and manufacture of high-productivity mining equipment for the surface and underground mining industries. (Doc. 63 ¶¶ 13, 31.) Its surface-mining equipment was used for mining coal, copper, iron ore, oil sands, and other minerals. (Doc. 63 ¶¶ 13, 31.) Bucyrus's underground-mining equipment was used for mining coal and minerals such as potash and trona. (Doc. 63 ¶¶ 13, 31.)

In its annual report for fiscal year 2009, filed with the Securities and Exchange Commission on March 1, 2010, Bucyrus reported an 18 percent increase in gross profit over the prior year. (Doc. 63 ¶ 36.) Although Bucyrus reported only a 3 percent increase in gross profit in the first quarter for fiscal year 2010, it reported a 20 percent increase in gross profits in its second quarter results and a 15.5 percent increase in gross sales in its third quarter results. (Doc. 63 ¶¶ 38, 39.)

In a Schedule 14A filing with the Securities and Exchange Commission on November 15, 2010, Bucyrus stated that it was "poised for continued growth. We have a strong brand, the most expansive offerings in surface and underground mining equipment, technological leadership, a strong and diverse network of customers, and a talented base of employees." (Doc. 63 ¶ 33.) Some analysts have stated that in some five-year period toward the end of the 2001-2010 decade, Bucyrus's earnings had grown over 101 percent while its industry as a whole had grown 8.3 percent. (Doc. 63 ¶ 34.) Moreover, analysts estimated that Bucyrus would continue to grow faster than the industry as a whole by 38.5

percent in fiscal year 2011 and 16.8 percent during the subsequent five years. (Doc. 63 ¶ 35.)

Defendant Timothy W. Sullivan was a director of Bucyrus and served as the company's President and Chief Executive Officer after March 2004. (Doc. 63 ¶ 14.) Earlier, he served briefly as the company's Chief Operating Officer. (Doc. 63 ¶ 14.) Defendant Theodore Rogers was a director of Bucyrus and served as Chairman of the Board commencing March 2004; he preceded Sullivan as Chief Executive Officer and at one time served briefly as President. (Doc. 63 ¶ 15.) Defendants Gene E. Little, Robert L. Purdum, Robert C. Scharp, Paul W. Jones, Robert K. Ortberg, Michelle L. Collins, and Deepak T. Kapur were directors of Bucyrus. (Doc. 63 ¶¶ 16-22.) (The court will refer to these persons as the "directors" or the "individual defendants" and the board of directors as the "board.")

Caterpillar Inc. is the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives. (Doc. 63 ¶ 24.) It is listed and traded on the New York Stock Exchange. (Doc. 63 ¶ 24.)

In the fall of 2009, Bucyrus and Caterpillar discussed a joint venture in the mining equipment business. (Doc. 63 ¶ 40.) A focus of the discussions was a line of hydraulic excavators, which neither company produced, and the potentially lucrative business that could be generated by providing a wider range of services to the mining industry. (Doc. 63 ¶ 40.) Discussions about a joint venture terminated around February 2010. (Doc. 63 ¶ 41.)

On February 19, 2010, Bucyrus completed an acquisition of Terex Corporation's mining equipment business, positioning Bucyrus as "the premier supplier of mining

equipment in the world." (Doc. 63 ¶ 37.) Terex's principal asset was a line of hydraulic excavators and related mining equipment. (Doc. 63 ¶ 41.)

In August 2010, the CEOs of Bucyrus and Caterpillar met again to discuss "some type of combination." (Doc. 63 ¶ 42.) Soon afterward, Bucyrus's board retained two investment banking firms, Deutsche Bank Securities Inc. and UBS Securities LLC, to serve as financial advisors regarding discussions with Caterpillar. (Doc. 63 ¶ 43.) Neither advisor was asked to solicit potential competing buyers, even though they informed the board that competing buyers existed. (Doc. 63 ¶ 43.) Deutsche Bank and UBS were each paid $2 million for their opinions, plus $21.3 million upon completion of a merger with Caterpillar. (Doc. 63 ¶ 43.)

The Bucyrus board decided not to reach out to other bidders because it did not think anyone else would be interested. (Doc. 63 ¶ 44.) During discussions with Caterpillar, the board required from Caterpillar a representation that it would continue Bucyrus operations in South Milwaukee and retain the Bucyrus brand for certain products. (Doc. 63 ¶ 45.)

On November 15, 2010, various defendants announced that they had entered a merger agreement pursuant to which Caterpillar would purchase all of Bucyrus's outstanding shares for $92.00 per share. (Doc. 63 ¶¶ 2, 46.) An announcement indicated that the transaction was valued at about $8.6 billion and reflected a premium of 32 percent on Bucyrus's share price as of November 12, 2010. (Doc. 63 ¶ 46.) Badger Merger Sub, Inc., a wholly-owned subsidiary of Caterpillar, was created as a vehicle to effectuate the purchase of Bucyrus. (Doc. 63 ¶ 25.)

On December 21, 2010, Bucyrus issued the Proxy about the proposed merger. (Doc. 63 ¶ 9.) Shareholders approved the merger and the purchase was completed on July

8, 2011. (*See* Doc. 63 ¶ 3.) Badger Merger merged with Bucyrus, and the surviving entity became a wholly-owned subsidiary of Caterpillar. (Doc. 63 ¶¶ 3, 25.)

The Retirement System brings the case individually and as a class action on behalf of all holders of Bucyrus stock, except defendants and their affiliates, who allegedly were harmed by defendants' actions regarding the sale and merger. (Doc. 63 ¶ 78.) As of May 3, 2011, there were over 80 million outstanding shares of Bucyrus common stock. (Doc. 63 ¶ 80.)

Additional allegations specific to each claim are discussed below.

BREACH OF FIDUCIARY DUTIES

Count I of the Complaint asserts that the individual defendants knowingly, recklessly, and in bad faith violated the fiduciary duties of care, loyalty, good faith, candor, and independence owed to the former shareholders of Bucyrus. (Doc. 63 ¶ 88.) Allegedly, the individual defendants put their personal interests and the interest of Caterpillar ahead of the interests of Bucyrus's former shareholders and deprived the Bucyrus shareholders of the ability to make informed and intelligent decisions by failing to provide material information. (Doc. 63 ¶¶ 88-90.)

Plaintiff broadly contends that the transaction "was the product of a fundamentally flawed process, undertaken in breach of the Board's fiduciary duties, and designed to ensure the sale of Bucyrus to Caterpillar on terms preferential to Caterpillar and Company insiders." (Doc. 63 ¶ 47.) Specifically, according to the Complaint, the board

• "took pains to structure the [transaction] so that it would preserve a role for management going forward in the combined company, and enable certain Company insiders, including members of senior management and the Board, to accelerate

8

and monetize otherwise illiquid equity interests in the Company and secure other material insider benefits, including change-in-control payments, or 'golden parachutes'" (Doc. 63 ¶ 48);

- failed to shop Bucyrus to other potential buyers, even though informed by its financial advisors that competing buyers existed (Doc. 63 ¶ 49);

- agreed to deal protection devices that made it "nearly impossible" for competing buyers to successfully bid (Doc. 63 ¶ 50);

- failed to secure sufficient protection for the Bucyrus shareholders regarding regulatory scrutiny from antitrust authorities (Doc. 63 ¶ 51); and

- did not obtain consideration that adequately reflected Bucyrus's prospects going forward or its synergistic value to Caterpillar (Doc. 63 ¶ 52).

Count II of the Complaint claims that Caterpillar aided and abetted the individuals' breach of fiduciary duty. With this in mind, the court notes that "[a]s a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability." *In re Alloy, Inc.*, 2011 WL 4863716 at *14. Thus, Count II stands or falls with Count I for purposes of the present motion to dismiss.

A.     Duties of care and disclosure

The Delaware General Corporation Law provides that a corporation may include in its charter a provision eliminating or limiting the personal liability of its directors for breach of their fiduciary duty of care. 8 Del. Code § 102(b)(7). However, the exculpatory provision cannot eliminate or limit liability for breach of the duty of loyalty or acts done in bad faith. *Id.*; *see In re Alloy, Inc.*, 2011 WL 4863716 at *7.

Article Seventh of the Restated Certificate of Incorporation of Bucyrus International, Inc. provided that "[n]o director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the GCL as the same exists or may hereafter be amended." (Doc. 67 Ex. B at 4.) In light of this provision, the court must conclude that the individual defendants cannot be liable for any purported breach of their duty of care. *See, e.g.*, *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, *9-*10 (C.D. Cal. June 17, 2010).

A director's duty of disclosure arises out of the fiduciary duties of care and loyalty. *In re Alloy, Inc.*, 2011 WL 4863716 at *13-*14. To the extent that plaintiff asserts a violation of the directors' duty of disclosure that was made in good faith, those claims must be dismissed under the exculpatory provision in the certificate of incorporation. *In re Alloy, Inc.*, 2011 WL 4863716 at *14; *see Globis Partners, L.P. v. Plumtree Software, Inc.*, No. Civ. A. 1577-VCP, 2007 WL 4292024, *15 (Del. Ch. Nov. 30, 2007) ("Section 102(b)(7) applies to violations of a director's duty of disclosure."). To the extent that plaintiff asserts a violation of the directors' duty of disclosure that would fall under the duties of loyalty and good faith, the claim fails for the reasons discussed immediately below. Moreover, the Complaint contains no factual allegations that the board acted disloyally or in bad faith when authorizing the issuance of the Proxy.

B.     Duties of loyalty and good faith

Under Delaware law, directors, when making a business decision, are presumed to act on an informed basis, in good faith, and with the honest belief that the action taken was in the best interest of the company. *Globis Partners, L.P.*, 2007 WL 4292024 at *4. Courts

10

defer to a decision reached by a proper process and do not examine the wisdom of the decision itself. *Id.* The party challenging the decision bears the burden of rebutting the presumption. *Id.*

When directors are considering the sale or changing the control of a publicly held corporation, their fiduciary duties are satisfied by conduct that is geared toward getting the highest price for the shareholders. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986); *Brown*, 2010 U.S. Dist. LEXIS 60863, at *17-*18; *see Globis Partners, L.P*, 2007 WL 4292024 at *4. In other words, "shareholder wealth maximization must be the directors' foremost objective." *Brown*, 2010 U.S. Dist. LEXIS 60863, at *18. There is no single blueprint that a board must follow to fulfill its *Revlon* duty. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242-43 (Del. 2009); *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del. 1989). However, the board cannot tilt the playing field toward a particular buyer for reasons unrelated to the stockholders' ability to get top dollar or act to protect constituencies other than the stockholders. *See Revlon*, 506 A.2d at 184. In *Revlon*, for instance, directors breached their duties of care and loyalty by favoring noteholders over shareholders and one bidder over another. *See id.* at 182-84.

To claim breach of the duty of loyalty, plaintiff must set forth facts indicating that a majority of the directors either (1) acted in their own self interest or the interest of someone other than the shareholders, or (2) failed to act in good faith. *See In re Alloy, Inc.*, 2011 WL 4863716, at *7; *Brown,* 2010 U.S. Dist. LEXIS 60863 at *12; *Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.)*, No. 3621-VCN, 2009 WL 3206051, *6 (Del. Ch. Sept. 30, 2009).

1.    Self interest

To establish a breach of the duty of loyalty plaintiff must show that a majority of the directors was not disinterested and independent. *In re Alloy, Inc.*, 2011 WL 4863716, at *7. A director is considered interested if he or she will receive a personal, material benefit from the transaction that is not equally shared by the stockholders or if a corporate decision will have a material impact on the director but not the corporation or its stockholders. *Id.*; *Globis Partners, L.P.*, 2007 WL 4292024 at *5. Independence means that the director's decision is based on the corporate merits of the matter rather than extraneous considerations or influences, such as control by another director. *In re Alloy, Inc.*, 2011 WL 4863716, at *7. For instance, a director acts disloyally if he or she stands on both sides of a merger or is dominated and controlled by someone who did. *Brown*, 2010 U.S. Dist. LEXIS 60863, *12; *In re NYMEX S'holder Litig.*, 2009 WL 3206051 at *6.

Thus, to show that board members violated their duty of loyalty by acting on their own behalf or being controlled by someone who was, the plaintiff must show (1) that those members of the board had a material or substantial self interest in the transaction suggesting disloyalty and (2) that those members constituted a majority of the board, controlled or dominated the board as a whole, or failed to disclose their interests in the transaction to the board and a reasonable board member would have regarded that interest as a significant fact. *Brown*, U.S. Dist. LEXIS 60863, at *59; *Goodwin v. Live Entm't, Inc.,* No. Civ. A. 15765, 1999 WL 64265, *25 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999); *see Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995).

Here, plaintiff fails to assert any plausible claim of self interest or control by others. The only allegations in the Complaint bearing on the duty of loyalty (stated twice) are that

> defendants took pains to structure the Takeover so that it would preserve a role for management going forward in the combined company, and enable certain Company insiders, including members of senior management and the Board, to accelerate and monetize otherwise illiquid equity interests in the Company and secure other material insider benefits, including change-in-control payments, or "golden parachutes."

(Doc. 63 ¶¶ 4, 48.) But these are vague, conclusory accusations, unsupported by any facts of actual benefits received by the directors.

For instance, the Complaint states vaguely that the directors structured the transaction to preserve a role for management going forward in the combined company, but it provides no specifics on who in management received a job at Caterpillar, how that job came about, and how it shows self interest or control of the directors. Although the Complaint asserts that one director, Sullivan, was an employee of Bucyrus at the time of the merger, it fails to contend that Sullivan obtained any role at Caterpillar or the Bucyrus subsidiary following the merger. Further, even if Sullivan or someone else in management did obtain employment at Caterpillar or the Bucyrus subsidiary following the merger, the Complaint fails to assert that he or she obtained such a role at the expense of Bucyrus's shareholders or for the benefit of any director.

Similarly, although the Complaint asserts vaguely that the merger allowed senior management and the board to secure "material insider benefits" such as "golden parachutes" (Doc. 63 ¶ 48), it fails to specify who on the board or in management received

13

such benefits or even what such benefits were. The Complaint is short on facts that make such a claim plausible.[1]

Moreover, importantly, nothing in the Complaint suggests that the other directors were in any way beholden to or influenced by Sullivan or other management when considering or approving the merger. Sullivan's position as President and CEO by itself, without specific allegations of domination, fails to create an inference that he controlled the board. *See In re Alloy, Inc.*, 2011 WL 4863716, at *8. The Complaint fails completely to state why or how another director was or could have been controlled. Instead, it sets forth mere conclusions unsupported by facts. Moreover, the Complaint does not offer facts supporting a finding that a *majority* of the board received insider benefits or was influenced on behalf of anyone receiving insider benefits. Nothing in the Complaint gives rise to any inference that the bulk of the board failed to act independently.

---

[1]Although the court relies on the Complaint at this stage, discussions at the preliminary injunction hearing confirm the lack of any facts showing benefits for the directors:

THE COURT: You keep referring to they might be getting jobs, and so forth. Do you have something suggesting that members of the Board are going to get jobs? I read in the Proxy statement several things. One is, there's only one person, Mr. Sullivan, who is not considered to be independent. And there's no indication I recall from the Proxy statement that another member of the Board who was part of the decision making process respecting the merger was going to receive anything other than cashing out of their stock and options. And with respect to the executive committee, they would receive the benefits that they would otherwise be entitled to receive under the terms of their employment. Is there something else that you know that is not obvious from what I've just mentioned? Or what was stated in the Proxy statement?

MR. O'BRIEN: No. Everything you say, Your Honor, is accurate. I was referring to upper level executives. And you're right, Your Honor, with respect to the Board who's deciding the -- you know, who's making the actual decision, you have stated that accurately. I'm talking about management forecasts. So management forecasts were not created by the Board alone. They're created by other people. And it's my understanding that the people who had these management forecasts will continue in their employment.

*City of Sterling Hts. Police & Fire Retirement System v. Bucyrus Int'l, Inc.*, No. 10-C-1106, Tr. of 1/18/11 Hr'g at 22-23 (filed Feb. 18, 2011) (i.e., Doc. 72 in Case 10-C-1106).

14

The Complaint claims that the merger allowed senior management and the board "to accelerate and monetize otherwise illiquid equity interests in the Company." (Doc. 63 ¶ 48.) However, the illiquid equity interests are not defined, although they presumably could include stock options or holdings of value. However, to the extent the board members held equity stakes in Bucyrus, their position was aligned *with* other Bucyrus stockholders to generate the highest stock sale price possible. *See Globis Partners, L.P.*, 2007 WL 4292024 at *8 ("The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price."). Thus, no benefit flowed to directors holding stock or options that was not shared by all stockholders. Moreover, notably absent from the Complaint are assertions that any director's compensation was contingent on the merger or facts suggesting that a financial interest of the directors affected their decision making.

Plaintiff's criticisms of the board for not finding alternative bidders or evaluating alternative transactions do not implicate director self interest or lack of independence. *In re Alloy, Inc.*, 2011 WL 4863716, at *8. At most, such allegations support a claim for breach of the duty of care. *Id.* Moreover, the Complaint does not even hint that any director had a tie to or was influenced by Caterpillar. Thus, plaintiff's claim of a violation of the duty of loyalty based on self interest or control is not plausible.

2.     Good faith[2]

Violation of the duty of good faith involves (1) an intentional failure to act in the face of a known duty to act, demonstrating a conscious disregard for one's duties, or (2) a

---

[2]The duty of good faith is sometimes discussed as part of the duty of loyalty and sometimes as a separate fiduciary requirement. *See Brown*, 2010 U.S. Dist. LEXIS 60863 at *12; *In re Alloy, Inc.*, 2011 WL 4863716 at *7.

decision so far outside of reasonable judgment that the only explanation could be bad faith. *In re Alloy, Inc.*, 2011 WL 4863716, at *7, *10; *Brown*, 2010 U.S. Dist. LEXIS 60863, at *12, *15; *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009); *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006). Grossly negligent conduct, without more, does not constitute a breach of the fiduciary duty to act in good faith. *Brown*, 2010 U.S. Dist. LEXIS 60863, at *15; *In re Walt Disney Co.*, 906 A.2d at 65. "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *In re Alloy, Inc.*, 2011 WL 4863716, at *10; *Lyondell*, 970 A.2d at 243. Plaintiff must allege and establish an "extreme set of facts" to sustain a claim of bad faith. *Lyondell Chem. Co.*, 970 A.2 at 243.

Plaintiff submits that the individual defendants acted in bad faith because they agreed to deal protection devices, including a no-shop clause that precluded Bucyrus from communicating with or providing confidential information to potential competing bidders except under extremely limited circumstances, a matching-rights provision that gave Caterpillar three days to match any competing proposal, a poison pill lock-up provision that prevented a competing bidder from making an offer directly to shareholders, and a $200 million termination fee to be paid to Caterpillar in the event the transaction terminated in favor of a superior proposal. (Doc. 63 ¶ 50.)

As stated above, under Delaware law, directors are obligated to obtain the best price for the stockholders in a sale of the company. *Lyondell Chem. Co.*, 970 A.2d at 242; *Revlon*, 506 A.2d at 182. But "[n]o court can tell directors exactly how to accomplish that goal, because they will be facing a unique combination of circumstances, many of which

will be outside their control." *Lyondell Chem Co.*, 970 A.2 at 242. Again, there is no single blueprint that a board must follow to fulfill this duty. *Id.* at 242-43.

A board is not required to conduct an auction process and is not prevented from offering bidders deal protection such as termination fees during merger negotiations so long as such decisions are designed to maximize share price. *Brown*, 2010 U.S. Dist. LEXIS 60863; *see Toys "R" Us Inc. S'holder Litig.,* 877 A.2d 975, 1000-01 (Del. Ch. 2005). Delaware courts have recognized that termination fees, no-solicitation and matching-rights provisions, and poison pills are customary in corporate merger or acquisition situations. They are common contractual features that are not per se unreasonable and do not necessarily evidence bad faith when assented to by a board seeking to secure a high value bid for stockholders. *See In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 502, 503 (Del. Ch. 2010); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d at 1017.

> Potential suitors often have a legitimate concern that they are being used merely to draw others into a bidding war. Therefore, in an effort to entice an acquirer to make a strong offer, it is reasonable for a seller to provide a buyer some level of assurance that he will be given adequate opportunity to buy the seller, even if a higher bid later emerges.

*In re Cogent, Inc. S'holder Litig.*, 7 A.3d at 502. In *Lyondell Chemical Co.*, for instance, the court did not question a break-up fee of $385 million in a discussion regarding good faith. *See* 970 A.2d at 238, 241-44 (noting the trial court's remark that the deal protections were not unusual or preclusive but not discussing the fee further regarding a claim of bad faith). Generally, a termination fee of 3% to 3.75% of equity value is considered reasonable by Delaware courts. *In re Cogent, Inc. S'holder Litig.*, 7 A.3d at 503 & n.47.   Here, the directors are presumed to have acted in good faith, and plaintiff has not proffered specific facts to rebut that presumption. Noticeably, the Complaint does not contend that other

17

potential buyers existed. And if there were other potential acquirers, plaintiff does not discuss any who were prepared to pay at the level offered by Caterpillar. Further, the Complaint fails to contradict that the individual defendants consulted with management and financial advisors regarding the likelihood of other potential acquirers. Nothing in the Complaint sufficiently supports a finding that the decision not to shop Bucyrus to other potential buyers was unreasonable in the circumstances or that the only explanation could be the directors' bad faith. Further, the Complaint is silent regarding any deal protections that suggest bad faith. No facts in the Complaint suggest that the termination fee or other protective provisions deterred any particular buyer. According to the Proxy, the termination fee of $200 million was less than 2.5% of the total value of the company (Doc. 68 Ex. A at 31), less than amounts that Delaware courts have considered reasonable.

Because there are no legally prescribed steps that directors must follow to satisfy their duty to obtain the highest price, a claim that they failed to do all that they should have under the circumstances amounts only to a claim that the duty of care was breached. *Lyondell Chem. Co.*, 970 A.2d at 243-44. The mere allegation of a failure to take specific steps does not demonstrate any conscious disregard of the directors' *Revlon* duties. *Id.* at 243. The inquiry is whether the directors utterly failed to attempt to obtain the best price, not whether they did everything they could have done. *Id.* In *Lyondell Chemical Co.*, the Delaware Supreme Court directed judgment in the directors' favor on a shareholder's bad faith claim when directors met several times to consider a premium offer, were generally aware of the value of their company, knew the chemical company market, solicited the advice of financial and legal advisors, and attempted to negotiate a higher offer. *Id.* at 244.

Judgment in the directors' favor was directed even assuming that the directors did not consider conducting a "market check." *Id.*

Next, the Complaint submits that despite the hiring of antitrust counsel the board did not secure any agreement that would have protected shareholders in the event the transaction would have failed due to anticompetitive effects or a drawn-out antitrust review had taken place.[3] (Doc. 63 ¶ 51.) Although the Complaint acknowledges that the transaction occurred without antitrust scrutiny, it asserts that the board's conduct regarding antitrust risk "was indicative of its supine position to Caterpillar and disloyalty to Bucyrus' former shareholders." (Doc. 63 ¶ 51.)

The fact that no antitrust scrutiny occurred means that this allegation is a nonstarter. That the directors did not protect against a nonissue does not create a plausible claim. Moreover, the Complaint admits that the directors retained antitrust counsel and negotiated some antitrust-related merger provisions. (*See* Doc. 63 ¶ 51.) While it adds that the directors did not do enough, that is not the standard for a claim of bad faith and no facts are offered to show conscious disregard by the directors.

The Complaint charges that the merger transaction did not reflect Bucyrus's value going forward or its synergistic value to Caterpillar. It claims that when Bucyrus acquired Terex it became an attractive takeover target for Caterpillar and through the transaction Caterpillar was able to capture the value of Bucyrus at less than the actual synergistic value. "Bucyrus' former shareholders, on the other hand, were not allowed to share in these profits going forward, as this was a cash-out transaction that did not include any

---

[3]Plaintiff asserts four specific ways the board could have dealt with antitrust risk (Doc. 63 ¶ 51), but the specifics are immaterial for present purposes.

19

stock component for shareholders." (Doc. 63 ¶ 52.) According to the Complaint, the transaction allowed Caterpillar to reap the benefit of Bucyrus's bright future, acquisition of Terex, and other steps Bucyrus had taken, at a price that did not sufficiently reflect the Bucyrus shareholders' equity stake. (Doc. 63 ¶ 53.) The Complaint further asserts that the takeover consideration substantially undervalued Bucyrus: "Indeed, Bucyrus's stock traded at $75.08 per share as early as October 11, 2010, and the Company was sure to continue its upward momentum in the absence of the [transaction]." (Doc. 63 ¶ 54.)

At best, these allegations complain that the merger consideration was inadequate and that shareholders would have been better off by receiving Caterpillar stock or a higher price for their Bucyrus stock or that the directors breached their duty of care by not doing all that they could have done under the circumstances. But shareholders received $92.00 per share—a premium of 32 percent over the share price on the day before the merger was announced (according to the Complaint and Proxy) and 22.5 over the market price on October 11, 2010.

Courts have found that premiums of between 14 and 27 percent are, as a matter of law, not so far beyond the bounds of reasonable judgment to be inexplicable except as the product of bad faith. *See In re Alloy, Inc.*, 2011 WL 4863716, at *12. The value of Bucyrus to Caterpillar is not the measure of adequacy. Here, Bucyrus shareholders received substantially more than their shares were worth in the marketplace. In any event, this is not a stock valuation or duty of care case. A premium of 32 percent in the circumstances described in the Complaint does not support a plausible claim of bad faith by the directors. Further, the Proxy statement indicates that although a stock component was initially considered, Bucyrus directors or management preferred an all-cash

20

transaction because of issues regarding the timing for valuation of stock and the schedule for completing the transaction. (Doc. 68 Ex. A at 27-28.) The Proxy indicates that the all-cash decision was not the product of conscious disregard for shareholders but a subject that the board reasonably considered.

Interestingly, the Complaint identifies instances of conduct that suggest *good* faith. For instance, the board hired two different financial advisors. A "board's receipt of a fairness opinion typically supports a factual inference that the board acted properly when deciding to proceed with a transaction." *In re Alloy, Inc.*, 2011 WL 4863716, at *10. And, alleged flaws in a fairness opinion do not support a reasonable inference that the board's decision was so far beyond the bounds of reasonable judgment as to be based on bad faith. *Id.*

For all of these reasons, plaintiff's claim of bad faith is implausible in light of the facts alleged. Thus, the court will dismiss the fiduciary duty claims.

THE PROXY

Section 14(a) of the 1934 Act makes it unlawful to solicit proxies in contravention of Securities Exchange Commission rules, and Rule 14a-9 prohibits solicitations containing any false or misleading statement as to a material fact or omitting any material fact necessary to make the statements in the proxy not false or misleading. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384-85, 90 S. Ct. 616, 621-22 (1970); *Sec. & Exch. Comm'n v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011); *see* 17 C.F.R. § 240.14a-9.[4] Section 14(a)

_____

[4]Section 240.14a-9(a) provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact

"was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444, 96 S.Ct. 2126 (1976) (internal quotation marks omitted).

The Complaint contends that the Proxy, which recommended that Bucyrus's shareholders vote in favor of the transaction, was materially misleading because of omissions or misrepresentations of material information, in violation of federal law and the individual defendants' duty of candor and full disclosure under state law. (Doc. 63 ¶ 55.) Count III asserts that the individual defendants and Caterpillar violated § 14(a) of the 1934 Act and Rule 14a-9 by disseminating a proxy that misrepresented or omitted material facts. (*See* Doc. 63 ¶¶ 101, 102.) Count IV asserts that the individual defendants acted as controlling persons of Bucyrus and that they directly or indirectly influenced and controlled the company's decision making, including the content and dissemination of the Proxy. (Doc. 63 ¶ 109.) In addition, Caterpillar had direct supervisory control over the contents of the Proxy. (Doc. 63 ¶ 112.) The Complaint further charges that the individual defendants and Caterpillar are liable under § 20(a) of the 1934 Act because they had the ability to exercise control over and did control persons who violated § 14(a) and Rule 14a-9. (Doc. 63 ¶ 115.)

According to the Complaint, the Proxy omitted or misrepresented

_____

necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

- the potential joint venture between Bucyrus and Caterpillar that was discussed in the summer and fall of 2009 and the reasons why discussions were terminated (Doc. 63 ¶ 56);

- management's strategic plan and ten-year financial forecast as discussed with the board and presented to the financial advisors (Doc. 63 ¶ 57);

- the potential stock component of the merger consideration, including valuation and a collar provision (Doc. 63 ¶ 61);

- the basis for the board's decision not to seek potential competing bids (Doc. 63 ¶ 62);

- the due diligence issues that Caterpillar said could have negatively impacted the merger price by $4 per share (Doc. 63 ¶ 63);

- management's presentation regarding financial aspects of Caterpillar's proposal as discussed with the board on November 14, 2010 (Doc. 63 ¶ 64);

- the basis of Deutsche Bank's selection of EBITDA multiples in its illustrative discounted cash flow analysis (Doc. 63 ¶ 65);

- the selection and exclusion criteria used by Deutsche Bank in its analysis of selected precedent transactions (Doc. 63 ¶ 66) and its analysis of selected publicly traded companies (Doc. 63 ¶ 68);

- the transaction-by-transaction and company-by-company detail of the pricing multiples for the transactions selected by Deutsche Bank for its analysis of selected precedent transactions (Doc. 63 ¶¶ 67, 69);

- the basis for Deutsche Bank's decision not to analyze LTM EBITDA multiples in its Selected Publicly Traded Companies Analysis (Doc. 63 ¶ 70);

- the basis for UBS's EBITDA multiples in its discounted cash flow analysis (Doc. 63 ¶ 71);

- the selection and exclusion criteria used by UBS in its Selected Transactions Analysis (Doc. 63 ¶ 72) and its Selected Companies Analysis (Doc. 63 ¶ 74); and

- the transaction-by-transaction detail of the pricing multiples for UBS's Selected Transactions Analysis (Doc. 63 ¶ 73).

To succeed on a claim under § 14(a) and Rule 14a-9, a plaintiff must establish that (1) a proxy contained a material misrepresentation or omission, (2) such misrepresentation or omission caused the plaintiff injury, and (3) the proxy was an essential link in the accomplishment of the transaction. *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007); *Brown*, 2010 U.S. Dist. LEXIS 60863, at *64-*65; *Blau v. Harrison*, No. 04 C 6592, 2006 U.S. Dist. LEXIS 19795, *12 (N.D. Ill. Mar. 24, 2006); *see Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384-85, 90 S. Ct. 616, 621-22 (1970). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc.*, 426 U.S. at 449. "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*; *accord Brown*, 2010 U.S. Dist. LEXIS 60863, at *68-*69. "Omitted facts are not material simply because they might be helpful." *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000). Moreover, a conclusory statement that without certain information shareholders could not determine the company's value is insufficient to show materiality. *Globis Partners, L.P.*, 2007 WL 4292024 at *12.

24

The court notes that the standard for a breach of the fiduciary duty of disclosure under Delaware law also requires that an omission or misrepresentation have been of material information, and Delaware has adopted the U.S. Supreme Court's definition of materiality as set forth in *TSC Industries*. *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985); *Globis Partners, L.P.*, 2007 WL 4292024 at *10. To the extent that an alleged omission fails to meet the materiality element of § 14(a) or Rule 14a-9, it fails to meet the materiality requirement needed to sustain a claim against a claim against a fiduciary for failure to disclose. Moreover, because of the similarity of the materiality standards, Delaware cases involving materiality for purposes of the duty of disclosure are helpful for considering materiality under § 14(a) and vice versa.

To state a § 20(a) claim, the Complaint must assert (1) a primary securities violation; (2) that each defendant exercised general control over the operations of Bucyrus; and (3) that each defendant possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated. *See Blau*, 2006 U.S. Dist. LEXIS 19795 at 22; *also see Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994). Thus, a failure to establish a violation of § 14(a) and Rule 14a-9 results in a failure to establish the § 20(a) claim, too. *See Pugh*, 521 F.3d at 693.

A.     Prior negotiations in 2009 and why they were terminated

According to the Complaint, the Proxy mentions discussions between Bucyrus and Caterpillar regarding a potential joint venture for mining equipment business and notes that the companies' CEOs terminated the discussions. (*See* Doc. 63 ¶ 56 (citing Doc. 68 Ex. A at 25-26).) Allegedly the Proxy failed to disclose what the contemplated joint venture

entailed or why discussions broke off in February 2010. (Doc. 63 ¶ 56.) Moreover, the Complaint contends that Bucyrus's shareholders were entitled to know the strategic alternatives to the transaction the board considered, especially because prior discussions broke after Bucyrus acquired Terex, whose assets Caterpillar coveted. (Doc. 63 ¶ 56.)

Generally, it is not necessary to disclose all factors in a negotiation. *See Blau*, 2006 U.S. Dist. LEXIS 19795, at *21. Moreover, the Complaint cannot simply allege that some background information regarding the merger is lacking; it must explain *what* is lacking for the claim to be plausible. *See In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *15.

This is not a case like *Blau*, in which the proxy said that a merger offer to one company's shareholders was "fair, from a financial point of view," but failed to disclose a previous offer at a better share price, which the company's CEO had rejected because it meant he would not be CEO of the merged entity. *See* 2006 U.S. Dist. LEXIS 19795 at *20-*21. The *Blau* court found that the information regarding the more profitable offer was a fact that shareholders would have found important in considering whether to approve the merger. *See id.* Here, to the contrary, further information on the prior negotiations would not have affected the total mix of information for the shareholders. As set forth in the Complaint, the prior discussions did not concern details of a merger, but instead involved an unrelated joint venture arrangement. Moreover, the Complaint suggests that Bucyrus's acquisition of Terex changed the circumstances between the parties. Thus, discussions of a joint venture prior to the Terex acquisition appear irrelevant to discussions of a merger months after the Terex acquisition. The joint venture discussions would have been immaterial to a reasonable shareholder.

B.    Management's strategic plan and ten-year forecast

According to the Complaint, the Proxy referenced two board meetings (October 20 and October 29, 2010) at which management presented its strategic plan and financial forecasts. Subsequently, UBS and Deutsche Bank relied upon the forecasts for their financial analyses and the forecasts were shared with Caterpillar. (Doc. 63 ¶ 57.) The Complaint contends that these forecasts were not disclosed in the Proxy and were material because shareholders were entitled to know management's "best estimates of the Company's future cash flows," especially when the projections "formed the bases for the fairness opinions." (Doc. 63 ¶ 57.) In addition, says the Complaint, the projections underscore appropriate pricing multiples to apply to financial and operating metrics, especially for a cyclical company like Bucyrus—"[i]nclusion of the projections would have given the former shareholders of Bucyrus insight into management's assessment of Bucyrus' place in the industry cycle." (Doc. 63 ¶ 58.) For example, the Complaint suggests, inclusion of projections would have enabled shareholders to independently determine where along the continuum between the $72.50 and $107.00 discounted cash flow values given by the financial advisors future cash flows would have fallen. (Doc. 63 ¶ 59.) Moreover, plaintiff submits that omission of the projections rendered misleading (1) references in the Proxy to the two board meetings where the board discussed forecasts and the assumptions "underlying the plan"; (2) the reference in the Proxy to a discussion with Caterpillar in October 2010 when working teams met to review business model assumptions; (3) the summary in the Proxy of the Deutsche Bank opinion, particularly Deutsche Bank's illustrative discounted cash flow analysis, which was based on management estimates of cash flow, and the analysis of selected publicly traded

companies, which rested, in part, on management's estimated EBITDA for 2011; and (4) the summary in the Proxy of the UBS opinion, particularly regarding UBS's discounted cash flow analysis, which relied on forecasts and estimates prepared by Bucyrus management, and UBS's selected companies analysis, which was based, in part, on management's EBITDA for 2011 and 2012.

Generally, financial projections need not be disclosed in a proxy if they are speculative. *See Brown*, 2010 U.S. Dist. LEXIS 60863 at *69; *Globis Partners, L.P.,* 2007 WL 4292024 at *10 ("'Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information.'"). Projections are not material for disclosure purposes "unless the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment." *In re PNB Holding Co. S'holders Litig., C.A.*, No. Civ. A. 28-N, 2006 WL 2403999, *16 (Del. Ch. Aug. 18, 2006); *accord Globis Partners, L.P.*, 2007 WL 4292024 at *13 ("[U]nreliable projections may in fact be misleading.").

Moreover, a proxy need not include all financial data or projections that would be helpful in making an independent determination of fair value. *Skeen*, 750 A.2d at 1174; *In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *8; *In re Gen. Motors (Hughes) Litig.*, 2005 WL 1089021 at *16 & n.157. That financial advisors considered certain undisclosed information does not alter the analysis. *In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *8; *In re Gen. Motors (Hughes) Litig.;* 2005 WL 1089021 at *16. Stockholders are entitled to a "fair summary" of the work of financial advisors upon whose advice a board recommends how to vote on a merger. *Globis Partners, L.P.*, 2007 WL 4292024 at *11;

28

*In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *8. However, if a proxy discloses valuation information, that information must be complete and accurate. *In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *8-*10.

The court in *In re Checkfree Corp.* found that management projections, even though relied upon by financial advisors, were not material. The proxy statement sufficiently detailed the sources upon which the financial advisor relied, explained some of the assumptions and calculations management used in its estimates, noted comparable transactions and companies the advisor used, and described management's estimated earnings and estimated EBITDA. In addition, the fairness opinion was attached to the proxy. Further detail regarding raw financial projections by management was not material. 2007 Del. Ch. LEXIS 148 at *8-*10. Also, because the raw projections were admittedly incomplete, inclusion of them could have been misleading. *Id.* at *11.

On the other hand, in *Brown*, the company failed to disclose management's internal financial projections, which were used to formulate fairness analyses, and the court found that the internal projections could be material: "A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued." *Brown*, 2010 U.S. Dist. LEXIS 60863 at *70. Further, the court in *In re Netsmart Technologies, Inc. Shareholders Litigation*, 924 A.2d 171, 201-05 (Del. Ch. 2007), found that projections underlying a fairness opinion were material. In so holding, the court commented on the importance of financial projections generally:

> Faced with the question of whether to accept cash now in exchange for forsaking an interest in Netsmart's future cash flows, Netsmart stockholders would obviously find it important to know what management and the company's financial advisor's best estimate of those future cash flows would be. In other of our state's jurisprudence, we have given

credence to the notion that managers had meaningful insight into their firms' futures that the market did not. . . . Indeed, projections of this sort are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or . . . market multiples. What they cannot hope to do is replicate management's insider view of the company's prospects.

924 A.2d at 203.

Here, the information the Complaint contends should have been disclosed in the Proxy was a ten-year projection, which by its length would appear to be speculative. Moreover, the Complaint acknowledges that Bucyrus's business was cyclical, suggesting that projections could be unreliable. Nothing in the Complaint suggests that ten-year projections in Bucyrus's business would have been reliable. Thus, in consideration of the speculative nature of such forecasts, as noted *In re Checkfree Corp.*, additional detail in the Proxy regarding raw financial projections by management would not have been material. Moreover, in light of the opinions of the financial advisors who took projections into account, those projections would not have altered the total mix of information.

Further, the *In re Netsmart Technologies, Inc. Shareholders Litigation* situation differed greatly from the situation here. First, the projections at issue in *Netsmart* were created by the financial advisor, though using inputs or prior projections from management. *See* 924 A.2d at 201-04. Thus, disclosure of the projections was required as part of the fair summary of the financial advisor. *Id.* at 203-04. Second, the proxy in *Netsmart* disclosed two sets of projections, but neither was ultimately used by the financial advisor for its opinion. *See id.* at 202-03. Thus, as pointed out by the *In re Checkfree Corp.* court, the projections disclosed in the *Netsmart* proxy were misleading, as they failed to give stockholders the best estimate of the company's future cash flows as used by the

financial advisor. *See In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *10-*11; *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d at 202-03. Here, the Proxy did not disclose an incorrect set of projections.

C.      Stock component

According to the Complaint, the Proxy discussed a potential equity component in the form of Caterpillar stock but did not disclose the proposed value of that component or discuss a collar for that component to ensure it did not drop significantly in value, thereby making the mention materially misleading. (Doc. 63 ¶ 61.) It further indicated that the information was material because an equity component would have given shareholders an ownership interest in the surviving company to benefit from the synergies of the Terex acquisition. (Doc. 63 ¶ 61.)

If a company discloses some history leading to a merger, the company must provide an accurate, full, and fair characterization of those events. However, it need not provide a play-by-play description of merger negotiations. *Globis Partners, L.P.*, 2007 WL 4292024 at *14.

The Complaint essentially asserts that the shareholders preferred a payment that included equity in Caterpillar, so they could "benefit from the synergies of the Terex acquisition," over a cash purchase. Although the Proxy disclosed that negotiations had at one point included discussions of an equity swap, the lack of details respecting the valuation of such an equity component or collar did not make the Proxy misleading. Such play-by-play details of rejected terms during negotiations were not material; they would not have changed the total mix of information. The Proxy explained that board members considered the equity component and discussed the pros and cons of an equity

component (Doc. 68 Ex. A at 27); that was enough. Stockholders were asked to approve a cash transaction; no lack of discussion about the actual valuation of a discussed stock swap or collar misled stockholders about the transaction at hand or how it came to be.

D.     Basis for not seeking competing bids

The Complaint further asserts that the Proxy disclosed that the board did not "shop" the company because "it was highly unlikely that a credible alternative acquirer would emerge," and that the failure to disclose the basis for that decision made the Proxy materially misleading. (Doc. 63 ¶ 62; *see* Doc. 68 Ex. A at 27.) According to the Complaint, the basis for the board's decision not to shop the company was material because the Board had a duty to conduct at least some form of auction to secure the best price for shareholders and shareholders were entitled to know the board's efforts to maximize value. (Doc. 63 ¶ 62.)

In these allegations, the Complaint attempts to turn the failed bad faith claim into a disclosure claim. As noted above, the board did not violate any duty of loyalty or good faith merely by failing to shop the company. And the Complaint is short on facts suggesting that any other potential acquirers existed.

Moreover, omitted facts are not material simply because some shareholders may find the information helpful. Here, the Proxy stated:

> Our board members asked management and representatives of Deutsche Bank and UBS to discuss whether it was likely that other potential acquirers would emerge at the valuation levels implied by the Caterpillar proposal and after lengthy discussions of potential candidates our board of directors determined that it was highly unlikely that a credible alternative acquirer would emerge and offer a compelling transaction value without significantly greater execution risk to Bucyrus. Our board of directors also discussed the significant disadvantages of an open process for seeking alternative buyers.

(Doc. 68 Ex. A at 27.) Shareholders were told that the board did not shop the company because after discussion with its financial advisers the board believed no other acquirer would emerge with a better offer. That was sufficient information for a reasonable shareholder. Play-by-play details regarding the board's discussion or the board's decision would not have altered the total mix of information.

E.     Caterpillar's due diligence issues

The Proxy disclosed that in negotiations Caterpillar said certain due diligence issues could negatively impact the merger share price by about $4 per share. (Doc. 68 Ex. A at 28.) According to the Complaint, defendants needed to disclose what that information was because it potentially affected the consideration paid and shareholders "were entitled to all information bearing on the value of their equity interests and the consideration being offered." (Doc. 63 ¶ 63.)

What Caterpillar found during its due diligence cannot be considered material. What was material was that Caterpillar said it found something that potentially reduced how much Caterpillar was willing to pay. Whether Caterpillar valued that due diligence information accurately would not have altered the total mix of information available for a reasonable shareholder. The Proxy disclosed that a prior negotiated price had been $93 (with a Caterpillar stock component). (Doc. 68 Ex. A at 27.) The Proxy identified for shareholders a risk that to Caterpillar Bucyrus was worth $4 less than the amount Caterpillar had previously agreed to pay. The Proxy did not need to give detailed information on what Caterpillar found so that Bucyrus shareholders could do their own evaluation of the reduced offer. Such detail would not have altered the total mix of information.

F.    Management's presentation in November 2010 regarding financial aspects of Caterpillar's proposal

The Complaint further asserts that on November 14, 2010, management presented the board with an analysis of the Caterpillar proposal but none of that analysis was disclosed in the Proxy. It goes on to assert that the information was material because shareholders were entitled to know what the board relied on when agreeing to the merger. (Doc. 63 ¶ 64.) Moreover, the Complaint contends that management knew the company better than the financial advisors did and, therefore, shareholders were entitled to a fair summary of management's analysis. (*Id.*)

Although the Complaint charges that the Proxy failed to disclose what the board relied on before approving the merger, the Proxy undercuts that claim. It states that on November 14, 2010, the board of directors met, at which time representatives from a law firm reviewed the terms of the merger agreement with the directors and discussed the directors' fiduciary duties, Deutsche Bank and UBS delivered their oral opinions, and, important for the present issue, "Bucyrus management made presentations regarding financial aspects of the proposal from Caterpillar." (Doc. 68 Ex. A at 29.) The court is unconvinced that specific details about management's presentation to the board would have been material to a reasonable investor. The Proxy provided extensive information regarding the background of the merger agreement as well as a copy of the merger agreement, and the Proxy discloses key "financial aspects" of the proposal such as the share price and the cash-out nature of the transaction. Plaintiff presents nothing more than an argument that knowing what management thought about the deal may have been helpful. Helpful information is not the same as material information. Management's view

34

of the proposed agreement would not have altered the total mix of information for shareholders.

G.     Details regarding Deutsche Bank's analysis

According to the Complaint, the Proxy failed to disclose how Deutsche Bank derived the range of EBITDA multiples used in its illustrative discounted cash flow analysis, making that analysis materially misleading because shareholders were not in a position to know whether to rely on the bank's analysis and whether the analysis reflected the long-term intrinsic value of the company. (Doc. 63 ¶ 65.) The Complaint asserts that the choice of EBITDA multiples has a dramatic effect on discounted cash flow analysis, and Deutsche Bank appears to have selected multiples that were too low. (Doc. 63 ¶ 65.)

Further, the Complaint charges that the Proxy failed to disclose the basis upon which Deutsche Bank selected the five transactions it analyzed in its Analysis of Selected Precedent Transactions, rendering discussion of the analysis materially misleading because of the small sample size spanning a period of ten years. (Doc. 63 ¶ 66.) It claims that shareholders could not determine if the sample transactions were an adequate comparable set and whether they should rely on Deutsche Bank's analysis. (*Id.*) Similarly, the Complaint contends, the Proxy failed to disclose the basis upon which Deutsche Bank selected the companies for its Analysis of Selected Publicly Traded Companies, rendering discussion of the analysis materially misleading because, again, shareholders could not determine if the selected companies were an adequate comparable set and whether they should rely on the analysis. (Doc. 63 ¶ 68.)

In addition, it is alleged that the Proxy "disclosed only the high, low, mean, and median multiples for the selected transactions [and companies], but not the underlying

detail of the pricing multiples," such as transaction-by-transaction or company-by-company detail, rendering the analysis materially misleading because shareholders could not determine if the transactions sampled were comparable and because the multiples here were used to determine terminal EBITDA multiples for the illustrative discounted cash flow analysis. (Doc. 63 ¶¶ 67, 69.) Finally, the Complaint asserts that the Proxy failed to disclose why Deutsche Bank did not analyze LTM EBITDA multiples in its Selected Publicly Traded Companies Analysis: "[S]hareholders were entitled to know why it was not conducted here, which bears on the propriety of [their] reliance on the analysis at all." (Doc. 63 ¶ 70.) As a result, the Complaint claims that the omission rendered the discounted cash flow analysis even more misleading because the multiples derived from this analysis were used in selecting terminal EBITDA multiples in the illustrative discounted cash flow analysis. (*Id.*)

Stockholders are entitled to a "fair summary" of the work of financial advisors upon whose advice the board recommends a vote on a merger. *Globis Partners, L.P.*, 2007 WL 4292024 at *11; *In re Checkfree Corp.*, 2007 Del. Ch. LEXIS 148 at *8. Directors need not provide financial information that is merely helpful or is cumulative to other information provided, and they need not provide information required for stockholders to independently determine fair value. *Globis Partners, L.P.*, 2007 WL 4292024 at *11. Nor must they disclose all data underlying a fairness opinion such that a shareholder can make an independent determination of value. *Id.* at *13. Disclosures in proxy statements need not be so detailed that they no longer serve their purpose. *Id.* at *12.

In *Globis Partners*, the plaintiffs alleged that a financial advisor's analyses were flawed because the advisor should have used a different index in the public company

comparables analysis and improperly included transactions that were not publicly disclosed or not yet closed in the transaction comparables analysis. The plaintiffs contended that after eliminating such transactions the revenue multiple would have been higher, resulting in a higher value for the company's stock. The Delaware Chancery Court found no disclosure violation, as the proxy fairly summarized the valuation work the advisor performed and stockholders had sufficient information to determine whether they disagreed with the advisor's analyses. Subjective disagreements about the analyses did not constitute a disclosure problem; the advisor's judgments were adequately disclosed to the stockholders. *Id.* at *11.

Similarly, the *Globis Partners* court found no disclosure violations occurred due to the proxy's failure to include the discount rate used, the reasons for using different sets of comparable companies in different analyses, or additional details regarding the private companies mentioned in the analyses. *Id.* at *13. Again, a substantive dispute with the financial advisor's judgment did not support a claim of breach of the duty of disclosure. *Id.* at *13.

Here, similar to the situation in *Globis Partners*, plaintiff appears to be seeking detailed information so that shareholders could perform their own financial analyses. The Complaint acknowledges as much when it alleges, e.g., that shareholders could not determine if the transactions sampled were comparable. But that is not the standard for material information. The Proxy needed only to provide a fair summary of the work of the financial advisor, not the detail needed for shareholders to independently examine the financial advisor's work. The court has reviewed the Proxy's discussion of Deutsche

Bank's financial opinion and finds that it sets forth a fair summary of the work. The lack of further detail did not make the Proxy misleading.

H.     Details regarding UBS's analysis

Similar to the allegations regarding Deutsche Bank's analysis, the Complaint asserts that the Proxy failed to disclose how UBS derived the range of EBITDA multiples employed in its discounted cash flow analysis, which was material because UBS selected a range of terminal EBITDA multiples that appears to have been too low (Doc. 63 ¶ 71); it failed to disclose the basis upon which UBS selected the five transactions it addressed in its Analysis of Selected Precedent Transactions (Doc. 63 ¶ 72); and the basis upon which UBS selected the companies it addressed in its Selected Companies Analysis (Doc. 63 ¶ 74). Further, according to the Complaint, the Proxy "disclosed only the high, low, mean, and median multiples for the selected transactions, but not the underlying detail of the pricing multiples," rendering the analysis materially misleading inasmuch as shareholders could not determine if the transactions sampled were adequate comparables and because the multiple were used by UBS to determine terminal EBITDA multiples for its discounted cash flow Analysis. (Doc. 63 ¶ 73.)

Again, as with its claims regarding Deutsche Bank's work, the Complaint charges that the Proxy was short of detail that would enable shareholders to run their own analyses. However, the legal standard for disclosures requires only a fair summary of the financial advisor's work and the disclosure of material information. Thus, these claims fail for the same reasons as those aimed at Deutsche Bank's work.

CONCLUSION

For all of the above-stated reasons,

IT IS ORDERED that this consolidated case (Case Nos. 10-C-1104, 10-C-1106, and 11-C-1179) is dismissed.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2014.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE